**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

IVAN D. JONES, JR.,
Petitioner,

v.                                                                     No. 95-3119

SECURITIES & EXCHANGE COMMISSION,
Respondent.

On Petition for Review of an Order
of the Securities & Exchange Commission.
(No. 3-8037)

Argued: January 29, 1997

Decided: June 16, 1997

Before MURNAGHAN, NIEMEYER, and MOTZ, Circuit Judges.

_____

Affirmed by published opinion. Judge Niemeyer wrote the opinion,
in which Judge Murnaghan and Judge Motz joined.

_____

**COUNSEL**

**ARGUED:** Jonathan Drew Sasser, MOORE & VAN ALLEN,
P.L.L.C., Raleigh, North Carolina, for Petitioner. Susan Ferris
Wyderko, Senior Litigation Counsel, SECURITIES AND
EXCHANGE COMMISSION, Washington, D.C., for Respondent.
**ON BRIEF:** Jeffrey M. Young, MOORE & VAN ALLEN, P.L.L.C.,
Raleigh, North Carolina, for Petitioner. Paul Gonson, Solicitor, Rich-
ard H. Walker, General Counsel, Eric Summergrad, Principal Assis-
tant General Counsel, Catherine A. Broderick, Counsel to the

Assistant General Counsel, SECURITIES AND EXCHANGE COM-
MISSION, Washington, D.C., for Respondent.

_____

## OPINION

NIEMEYER, Circuit Judge:

Ivan D. Jones, Jr., a stockbroker, was censured, suspended briefly,
and fined in October 1992 by the National Association of Securities
Dealers ("NASD") for illegal conduct in connection with two private
offerings and various "back room" violations. Approximately six
months later, the Securities and Exchange Commission ("SEC") insti-
tuted a broader administrative proceeding against Jones arising out of
the same conduct. Finding that Jones violated various antifraud,
recordkeeping, and reporting provisions of the Securities Act of 1933,
the Securities Exchange Act of 1934 ("Exchange Act"), and the
Investment Advisers Act of 1940 ("Advisers Act"), the SEC sus-
pended Jones from association with a broker-dealer or investment
advisor for 12 months and thereafter from association in a proprietary,
supervisory or managerial capacity with a right to reapply for such
association after 18 months.

Petitioning for review of the SEC's order, Jones contends that the
NASD's prior disciplinary action precludes the SEC from bringing
this proceeding because to do so violated (1) principles of res judi-
cata; (2) the Maloney Act of 1938, 15 U.S.C. § 78o-3; and (3) the
Fifth Amendment's Double Jeopardy Clause. He also challenges the
sufficiency of the evidence to support the SEC's order and the reason-
ableness of his 30-month suspension, contending it was "unduly
harsh." For the reasons that follow, we affirm.

I

Jones became a stockbroker in 1968, and in 1989 he became an
officer and director of Jones & Ward Securities, Inc. (previously
Akers and Jones Securities, Inc.) (hereafter "Jones & Ward Securi-
ties"), a registered broker-dealer. Jones informed the NASD that he
would be Jones & Ward Securities' "control person" who would han-

2

dle all important responsibilities. A few years earlier he had also become an officer and director of Investment/Timing Systems, Inc. ("ITS"), a registered investment advisor.

In March 1989, Trask, Hunt, Hunt, Jones, Ltd. ("THHJ"), a corporation formed to invest in real estate, acquired an unimproved tract of land and an adjacent office building in Wilmington, North Carolina. Three of the THHJ owners, including Jones, formed Sidbury Land Company to raise money for the purchase of the unimproved THHJ tract by offering common stock to investors through a private placement ("Sidbury Offering"). The owners of THHJ likewise formed One Virginia Partners to raise money for the purchase of the adjacent office building by offering general partnership interests ("OVP Offering").

In April 1989, Jones and his attorney, L. Bruce McDaniel, drafted a circular for the Sidbury Offering, with Jones & Woods Securities acting as underwriter, to sell 38,400 shares of common stock at $10 per share. The shares were to be sold in 1,200-share units to not more than 32 purchasers with a fifty percent "part or none" proviso: if less than $192,000 were raised by August 10, 1989, investors would be refunded their money with interest. The circular provided that "the first $192,000 of sales proceeds will be escrowed with United Carolina Bank of Wilmington, North Carolina. After $192,000 in stock has been sold, those escrowed funds will be released to the Company." Investors were instructed to forward their subscription payment to "Sidbury Land Company Escrow Account."

Jones' attorney, McDaniel, later testified that he explained to Jones that the escrow account referred to in the circular would have to be set up so that the bank held the investors' money beyond Jones' control. He testified that he had explained to Jones that Jones should establish a "true escrow," an arrangement he described as requiring that "the bank hold[ ] money in trust, and [that] they cannot release it except in accordance with terms of the escrow agreement." When McDaniel and Jones had a discussion about who should draft the escrow agreement, Jones assured McDaniel that Jones would take care of it. McDaniel testified later that he also explained to Jones that if the $192,000 were not on deposit by August 10, 1989, the offering

3

could not be extended. Rather, Jones would be required to refund the subscribers' money and "restart from scratch."

Instead of opening an escrow account beyond Jones' control, as McDaniel had advised, Jones opened a regular checking account labeled "Sidbury Land Co., Inc. Escrow Account" and deposited underwriting proceeds into the account subject to unrestricted withdrawal over his signature. On July 10, 1989, after Jones had agreements for the purchase of $192,000 worth of stock but when the escrow account had only $108,000 in it, Jones withdrew $9,600 from the escrow account to pay Jones & Ward Securities for underwriting commissions and $13,460 to pay THHJ for various fees and expenses incident to the offering. On July 28, 1989, Jones withdrew another $9,350 from the escrow account to pay interest on a loan that THHJ had taken out to finance the purchase of the undeveloped land that it owned. As of August 10, 1989, the last day of the offering, the escrow account did not have $192,000 as specified in the offering circular, although it would have had $192,000 in it had Jones not earlier withdrawn the $32,410 for various expenses. Rather than starting over from scratch, Jones extended the offering period, and ultimately, in March 1991, the Sidbury Land Company did purchase the unimproved property from THHJ.

In late May 1989, about a month after the Sidbury Offering began -- when the offering "started to get a little sticky," as McDaniel stated -- Jones began to offer certain investors, but not all, the right to have their shares repurchased at any time by THHJ at the offering price. Jones explained that he simply wanted to "enhance the offering over and above the private placement memorandum, by offering [some investors] some liquidity." THHJ, however, did not have sufficient assets to honor the repurchase agreements, although Jones later claimed that THHJ then had a sufficient line of credit with a bank.

Parallel with the Sidbury Offering, One Virginia Partners began the OVP Offering of partnership shares to investment advisory clients of ITS, as well as others, to raise $490,000 to purchase the THHJ-owned office building next to the undeveloped Sidbury Land Company property. The cost of the building was estimated at approximately $425,000. The offering materials used by Jones and ITS indicated that seven partnership interests would be sold at $70,000 each and that

4

funds received from each investor prior to April 28, 1989, would be held in an escrow account. As he did with the Sidbury Offering, Jones opened a regular checking account under his control and deposited the offering's proceeds into that account. Without the prior consent of the partners, Jones withdrew $25,000 from the One Virginia Partners escrow account and paid it to THHJ to enable it to purchase an option on unrelated real estate known as Parkshore Estates. Similarly, he loaned $20,000 from the escrow account to Southeastern Car Care Center # 1, a company that went into bankruptcy soon thereafter. Jones used $60,000 of the One Virginia Partnership escrow funds to purchase 6,000 shares of Sidbury Land Company stock, thereby enabling Sidbury Land Company finally to acquire the unimproved property that was described in its offering circular. Finally, in the fall of 1989, Jones withdrew $20,000 from the One Virginia Partnership escrow account to lend it to Jones & Ward Securities for ongoing operations. About ten months later, Jones & Ward Securities issued a demand note to One Virginia Partnership for the $20,000 that it had borrowed, and later it repaid the loan. Jones personally also made good the loss of the funds invested in the bankrupt car-care center.

During the relevant period, April 1989 to April 1990, the SEC required broker-dealers to maintain net capital of at least $25,000 if they held customer funds or securities or owed money or securities to customers. If they did not hold customer funds or owe customers money, they could operate with a minimum net capital of $5,000. See Exchange Act Rule 15c3-1(a), 17 C.F.R. § 240.15c3-1(a). The same rule provides that a "$5,000 broker-dealer" could participate in a "part or none" offering only if the offering proceeds were held by an independent escrow agent. Throughout the April 1989- April 1990 period and thereafter, Jones & Ward Securities purported to operate as a $5,000 broker-dealer. When Jones failed, however, to place the Sidbury Offering proceeds into an independent escrow account, the firm's net capital requirement increased from $5,000 to $25,000, resulting in capital deficiencies for several months. In December 1989, an examiner from the NASD advised Jones & Ward Securities to report its net capital deficiencies to regulatory authorities as required by Exchange Act Rule 17a-11, 17 C.F.R.§ 240.17a-11, but Jones refused to do so. And from December 1990 through February 1991 and from April 1991 through June 1991, Jones & Ward Securities operated with net capital under even the $5,000 requirement.

5

Jones & Ward Securities' records were also inadequate. In order to get approval to open Jones & Ward Securities in 1989, Jones falsely represented to the NASD that his records were accurate and current. Moreover, Jones agreed with the NASD to qualify as a Financial Operations Principal (FINOP) within 90 days, but failed to do so for two years despite NASD's denial of a waiver of the FINOP requirement. From April 1989 through March 1991, although Jones & Ward Securities did maintain some records, the records were neither accurate nor current. The firm did not maintain appropriately itemized blotters and ledgers as well as wire transfer confirmations, all as required by Exchange Act rules. See, e.g., 17 C.F.R. §§ 240.17a-3(a)(1)-(3), (8), & (11); 240.17a-5; 240.17a-11. Indeed, during their examination in 1989, the NASD examiners could not even determine Jones & Ward Securities' net capital from its records. In 1990, NASD auditors had to create an entirely new set of books to complete the 1989 audit. Jones & Ward Securities also failed to file quarterly financial reports from April 1, 1989, through December 31, 1990; failed to file its 1989 annual report; and failed timely to file its 1990 annual report. The firm also failed to maintain an accurate broker-dealer registration and failed to give the SEC the required telegraphic notice of its net capital and record-keeping problems.

As a result of its 1989 examination of Jones & Ward Securities, the NASD issued a 10-count complaint against Jones, his firm, and another officer of the firm because of their handling of both the Sidbury Offering and the OVP Offering, their failure to maintain adequate capital amounts, and their failure to keep adequate records. Following negotiation with NASD, Jones reached a settlement with the NASD under which the NASD issued a "Decision and Order of Acceptance of Offers of Settlement" dated October 9, 1992. In its Decision and Order, the NASD found that Jones had violated various NASD rules, the Exchange Act, and various rules promulgated under the Act. The NASD district director noted, however, that "no public customers have complained of any harm from their investments with the firm" and that various requests made by the NASD staff had been resolved to the staff's satisfaction. The NASD sanctioned Jones with a censure, a three-day suspension, and a $22,500 fine. It also required Jones to requalify by examination as a "general securities principal."

Several months later, on May 6, 1993, the SEC issued a separate order instituting an administrative proceeding against Jones and oth-

6

ers under the Securities Act of 1933, the Exchange Act, and the Advisers Act, alleging antifraud violations, net capital violations, and books and records and reporting violations. In the proceeding, the administrative law judge ("ALJ") found that Jones had violated or aided and abetted violations of antifraud provisions in connection with the Sidbury Offering, that Jones aided and abetted violations of antifraud provisions of the Advisers Act by ITS in connection with the OVP Offering, and that Jones aided and abetted his brokerage firm's violation of net capital, record keeping and reporting requirements. The ALJ suspended Jones from association with any broker or dealer or investment advisor for 12 months and barred Jones thereafter from association with a broker or dealer or investment advisor in a proprietary, supervisory, or managerial capacity with the right to reapply after 18 months. Jones was also censured and enjoined from future violations. Upon its de novo review of the record, the SEC, in an opinion and order dated October 10, 1995, affirmed the sanctions imposed by the ALJ, and this petition for review followed.

II

Jones' principal arguments amount to an overarching contention that once the NASD had sanctioned him for violating its rules and several federal securities laws, the SEC could not also sanction Jones again based on the same conduct. To support this contention, he makes three points: (1) because the SEC has a right to review, modify, and cancel (but not increase) the NASD's sanction and did not do so, it is now bound by its decision not to do so under principles of res judicata; (2) to permit the SEC to increase the NASD's sanction through a separate proceeding violates the Maloney Act which recognizes the NASD as a quasi-public regulatory body whose sanctions the SEC may not increase, see 15 U.S.C.§ 78s(e); and (3) the SEC's sanction is a second penalty for the same conduct that violates the Fifth Amendment's Double Jeopardy Clause. These arguments present issues of first impression, and we discuss them seriatim.

A

Jones begins his first argument with the observation that the NASD is the SEC's "disciplinary agency or arm" and that the SEC has broad oversight over all of the NASD's activities. Indeed, any NASD disci-

plinary order may be appealed directly to the SEC or the SEC may review such an order on its own motion. See 15 U.S.C. § 78s(d)(2). He concludes, therefore, that "by accepting the NASD decision [in this case] without modification, the SEC implicitly adopted it as its own," and the NASD's decision therefore "became a final SEC decision." Accordingly, Jones concludes, the SEC is bound under principles of res judicata by the NASD's disciplinary order. Alternatively, Jones contends that even if the SEC was not a party to the NASD proceeding, the NASD and the SEC were in privity with each other for purposes of applying res judicata because they are both agencies of the United States government and because the SEC has pervasive supervisory authority over the NASD.

Res judicata bars a cause of action adjudicated between the same parties or their privies in a prior case. See Meekins v. United Transp. Union, 946 F.2d 1054, 1057 (4th Cir. 1991). This is because a personal judgment in favor of a plaintiff extinguishes the plaintiff's claim. See Restatement (Second) of Judgments§ 17 (1980); see also id. § 18. To establish a res judicata defense, a party must establish: "(1) a final judgment on the merits in a prior suit, (2) an identity of the cause of action in both the earlier and the later suit, and (3) an identity of parties or their privies in the two suits." Meekins, 946 F.2d at 1057 (internal quotations and citations omitted).

At the outset, we assume, for purposes of considering Jones' argument, that a prior SEC decision based on the NASD's disciplinary order would have preclusive effect to the same extent as any other agency decision where the agency acts in an adequately judicial capacity. The SEC has not suggested otherwise in this case. "When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose." United States v. Utah Constr. & Mining Co., 384 U.S. 394, 422 (1966) (superseded by statute on other grounds); see also Astoria Federal Sav. and Loan Ass'n v. Solimino, 501 U.S. 104, 107 (1991) (noting the presumption in favor of the Utah Constr. & Mining rule, absent contrary congressional intent); University of Tennessee v. Elliott, 478 U.S. 788, 797 (1986) (holding that the factual findings of federal agencies functioning in an appropriately judicial capacity enjoy preclusive effect in federal

8

courts); Restatement (Second) of Judgments § 83 (1980); 2 Kenneth C. Davis & Richard J. Pierce, Jr., Administrative Law Treatise § 13.3, at 248-59 (3d ed. 1994). Thus, while Jones may be able to identify a final judgment on the merits entered by the NASD against him based on his conduct in connection with the Sidbury and OVP Offerings, he can establish neither the second res judicata requirement that the SEC's subsequent enforcement action is the same cause of action as the NASD's enforcement action nor the third requirement that the SEC and the NASD are in privity with each other for res judicata purposes.

With respect to the second res judicata requirement that the causes of action be identical, the nature of the statutory scheme and the relationships between the parties under it reveal that the NASD's enforcement action is not the same cause of action as the SEC's own later enforcement action. While the Exchange Act's methods for regulating fraudulent and unethical conduct in the over-the-counter securities markets were originally limited to enforcement provisions for registration, inspections, and fraud prosecutions, those large-scale mechanisms were thought to be inadequate "to protect the investor and the honest dealer alike from dishonest and unfair practices by the submarginal element in the industry" and inadequate "to cope with those methods of doing business, which, while technically outside the area of definite illegality, are nevertheless unfair both to customer and to decent competitor, and are seriously damaging to the mechanism of the free and open market." S. Rep. No. 75-1455, at 3 (1938); H.R. Rep. No. 75-2307, at 4 (1938). Rather than expand the SEC bureaucracy to enforce the regulation of "financial responsibilities, professional conduct, and technical proficiency," in 1938 Congress elected to expand regulation through the enactment of the Maloney Act, 15 U.S.C. § 78o-3, which mandates industry self-regulation through the creation of registered national securities associations. S. Rep. No. 75-1455, at 3-4; H.R. Rep. No. 75-2307, at 4-5. The intent was to establish a "cooperative regulation" where such associations would regulate themselves under the supervision of the SEC. Id.

Under the Maloney Act, which amended the Exchange Act, registered securities associations are authorized to adopt rules which the SEC must, with limited exceptions, approve prior to their implementation and which the SEC may abrogate or amend as it deems in the

9

public interest, consistent with the requirements of the Exchange Act. See 15 U.S.C. § 78s. Moreover, such associations must notify the SEC of all final orders disciplining association members. See 15 U.S.C. § 78s(d). A disciplined member may appeal to the SEC, or the SEC may, on its own motion, review final association disciplinary orders. See id. On review, the SEC is authorized to affirm, cancel, reduce or require remission of the NASD's sanction. See 15 U.S.C. § 78s(e). But no provision is made for the SEC, on review of an association's disciplinary order, to increase the sanction.

Following enactment of the Maloney Act, only the NASD, which is a private, nonprofit corporation organized under the laws of Delaware, has registered as a national securities association. See 6 Louis Loss & Joel Seligman, Securities Regulation 2794-95 (3d ed. 1990). In furtherance of its statutorily mandated role, the NASD adopted Rules of Fair Practice implementing its prescription that NASD members "observe high standards of commercial honor and just and equitable principles of trade." NASD Rules of Fair Practice Art. III § 1 (1992) (current version at Conduct Rule 2110, NASD Sec. Dealers Man. (CCH) ¶ 4111 (1996)).

In addition to the Maloney Act's authorization of the NASD to discipline its members, the Exchange Act and the Adviser's Act explicitly authorize the SEC to discipline securities professionals directly. See 15 U.S.C. § 78o(b)(4) & (6); 15 U.S.C. § 80b-3(e) & (f). We have found no statutory, regulatory, or historical reference to support Jones' argument that NASD discipline of its members was intended to preclude this disciplinary action by the SEC itself against a securities professional. On the contrary, the SEC has repeatedly interpreted the Maloney Act not to inhibit its independent inquiry into improper practices. See Shearson, Hammill & Co., Exchange Act Release No. 34-7743, 42 S.E.C. 811, 852 n.88 (Nov. 12, 1965); Lile & Co., Inc., Exchange Act Release No. 34-7644, 42 S.E.C. 664, 668 & n.13 (July 9, 1965). Indeed, the scope of sanctions that the two institutions may impose varies significantly in that the NASD's greatest sanction is merely to expel a member, revoke his registration, and bar him from association with NASD members. See Lile & Co., 42 S.E.C. at 668 n.12; 6 Loss & Seligman, supra, at 2824. As the SEC characterized the NASD's function in Lile & Co.:

10

The major issues in NASD disciplinary proceedings are whether a member or a registered representative violated the Association's Rules of Fair Practice, and whether a respondent's affiliation with the association should be suspended or terminated. The NASD enforces compliance by its members not only with legal standards but also with ethical concepts applying to dealings with both the public and other professionals in the securities business. It fixes standards and controls practices of its members within such concepts as the "promotion of just and equitable principles of trade."

Lile & Co., 42 S.E.C. at 668 n.12. The SEC, in contrast, has substantially more powerful authorizations, including the right to seek injunctive relief, see, e.g., Exchange Act§ 21(d)(1), 15 U.S.C. § 78(d)(1); Advisers Act § 209(d), 15 U.S.C. § 80 b-9(d), and to initiate criminal prosecution under a wide number of provisions, see, e.g., Exchange Act § 32(a), 15 U.S.C. § 78ff(a); Advisers Act § 217, 15 U.S.C. § 80b-17.

In this case, the NASD charged Jones with ten violations of its Rules of Fair Practice and related statutory provisions, and following a negotiated settlement, the NASD entered an order censuring Jones, suspending him for three days, and fining him $22,500. No party appealed that order to the SEC, nor did the SEC on its own motion review it. Thus, the NASD order amounts to a final, internal NASD order sanctioning Jones for violating the NASD's established rules. And the gravity of the sanctions is the product of NASD judgment.

The SEC's action, in contrast, was a public, administrative proceeding designed not only to protect the integrity of the markets but also to vindicate the public interest as determined by an agency of government created by Congress to enforce the securities laws. While the SEC has important roles in both the NASD's proceedings and its own administrative enforcement proceedings, its roles in the two proceedings vary, as does the nature of each proceeding. The NASD's proceedings are intended to provide front-line, less formal enforcement of rules governing day-to-day operations of over-the-counter securities markets. On the other hand, the SEC administrative proceedings cover all markets and organizations and are designed to pre-

11

vent and to punish more serious securities laws violations which, as the SEC determines, must be redressed in the public interest.

While the NASD and the SEC both aim at providing efficient markets with fair disclosure, protecting investors, and preserving the integrity of markets, their respective roles, while coordinated, vary in more than degree. They represent distinct interests. Congress' decision to give both the NASD and the SEC overlapping disciplinary authority reflects a considered decision to bring two separate vantage points to enforcement efforts -- one from the industry itself and the other from the regulator. Consistent with these varying, but cooperative roles, the SEC thus acts as supervisor and adjudicator of the NASD's action but as prosecutor and adjudicator in its own enforcement efforts.

The judgmental differences of the two enforcing bodies manifested themselves in this case. Before the NASD, Jones was charged with violations of NASD rules and related statutory provisions, and he was disciplined as a NASD member. Before the SEC, Jones was charged with similar and analogous statutory violations, but with additional scope. He was charged not only under the Exchange Act, but also under the Advisers Act, and he was subjected to greater discipline as well as to injunctive relief.

While the proceedings before the NASD and the SEC vary in function and scope, we grant that their objective is undoubtedly similar and arguably duplicative in some respect. Even if the duplicative aspect becomes the center of focus, however, Jones still fails with his res judicata defense because of his clear inability to establish an identity of the parties to the two proceedings. The SEC was not a party to the NASD proceeding. Its role, if any, was as potential reviewer of the NASD proceeding. But in this case, the SEC did not review the NASD's sanction. Even had it exercised the right of review, however, as reviewer, the SEC does not become a party; its review role is an adjudicatory one.

While the SEC's role can be confused by the fact that the SEC is investigator, prosecutor, and adjudicator in any SEC initiated administrative proceeding, the various roles of the SEC are adequately separated in practice so that Jones cannot obtain support from this fact for

12

his res judicata defense. The SEC as prosecutor, i.e. its enforcement division, was never a party to the NASD proceedings and it would not, in the ordinary course, have been a party even if the SEC as adjudicator had reviewed the NASD order.

Even though for purposes of res judicata the identity of parties may be satisfied by persons in privity with parties, the privity requirement assumes that the person in privity is "so identified in interest with a party to former litigation that he represents precisely the same legal right in respect to the subject matter involved." Nash County Bd. of Educ. v. Biltmore Co., 640 F.2d 484, 493 (4th Cir. 1981) (quoting Jefferson Sch. of Soc. Science v. Subversive Activities Control Bd., 331 F.2d 76, 83 (D.C. Cir. 1963)). "[P]rivity attaches only to those parties whose interests in a given lawsuit are deemed to be `aligned.'" Comite de Apoyo a los Trabajadores Agricolas v. U.S. Dep't. of Labor, 995 F.2d 510, 514 (4th Cir. 1993). In the case before us, NASD's interest in prosecuting a disciplinary action does not represent the same legal right that the SEC has in reviewing it.

Notwithstanding an inability to satisfy the essential elements of a res judicata defense, Jones appeals at bottom to a general sense of unfairness, arguing, "In no other realm of Anglo-American jurisprudence could a person be so doubly liable to the same plaintiff." While double liability for the same conduct does, in the abstract, offend a certain sense of fairness, our system tolerates it and, at times, even requires it. An intoxicated driver who collides with another automobile may answer to the state for criminal charges for driving under the influence and to the victim for civil damages, even punitive damages. He may also answer to his employer if he was in the course of employment and even to the United States if his intoxication involved, for example, the use of prohibited drugs. Or even more analogously, we readily accept double liability imposed against a professional baseball player, first by his baseball club and then on another level by the Commissioner of Baseball. While both levels may be sanctioning the same conduct, they are serving separate interests. Thus, it is not surprising that the District of Columbia Circuit has expressly recognized the validity of simultaneous investigations of the same conduct by the SEC and the Department of Justice. See SEC v. Dresser Indus., Inc., 628 F.2d 1368, 1375-76 (D.C. Cir. 1980). Similarly, the Supreme Court has allowed the Food and Drug Administra-

13

tion to seek civil and then criminal penalties for the same conduct. See United States v. Kordel, 397 U.S. 1, 11 (1970); see also Hercules Carriers, Inc. v. Florida, 768 F.2d 1558, 1580 (11th Cir. 1985) (allowing relitigation by a state agency of issues already lost by another agency of the same state).

Analogously, in this case, Jones' conduct could easily have exposed him to yet further sanction. If his conduct had been sufficiently egregious, he could have been prosecuted criminally, see, e.g., Exchange Act § 32(a), 15 U.S.C. § 78ff(a); Advisers Act § 217, 15 U.S.C. § 80b-17, and if he caused damage, he could have become exposed to liability to victims. Our judicial system carefully defines, under established principles, those specific circumstances where double liability or punishment is fair and appropriate and when it is not. While res judicata defines one of those circumstances where successive penalties are not appropriate, Jones is unable to satisfy its requirements.

B

As a variation of his res judicata defense, Jones argues that the SEC's action exceeds the SEC's statutory authority because, when enacting the Maloney Act, Congress consciously divided the securities regulatory effort between industry self-regulation and SEC regulation.

To avoid bureaucratic expansion of the SEC, Congress did indeed delegate to registered securities associations, i.e., the NASD, the day-to-day policing of securities professionals while reserving to the SEC the residual policing of the "submarginal fringe which recognizes no sanctions save those of the criminal law and of dealing with those problems of regulation with which the industry, as organized under the act, finds itself unsuited or unable to deal." Report of the Special Study of Securities Markets of the Security and Exchange Commission, H.R. Doc. No. 88-95, pt. 4, at 606 (1963) (comments of Senator Maloney). While Congress placed a right to review NASD action in the SEC, it provided that the SEC could only affirm, modify, reduce or cancel the NASD's sanctions; it could not increase them. See id.; see also Mason, Moran & Co., Exchange Act Release No. 34-4832, 35 S.E.C. 84 n.25 (April 23, 1953) ("This Commission is not autho-

14

rized by statute . . . to increase the sanctions imposed by [the NASD]"); 6 Loss & Seligman, supra, at 2746 n.220. Jones argues that allowing the SEC to impose a more severe sanction than that imposed by the NASD would authorize the SEC to circumvent the Maloney Act. If the SEC were to find an NASD disciplinary sanction too lenient, its remedy, Jones argues, would be to remand the proceeding to the NASD for further proceedings. See 15 U.S.C. § 78s(e). In the extreme, Jones acknowledges, the SEC could set aside the NASD's sanction and open its own investigation, but it did not follow that procedure in this case.

While Jones is unable to point to any statutory provision, statutory interpretation, or legislative history that makes NASD-initiated discipline and SEC-initiated discipline mutually exclusive, he argues that if the SEC allows NASD disciplinary action to stand, it should not then be allowed to initiate a duplicate proceeding. As he summarizes:

> In enacting the Maloney Act, Congress could hardly have contemplated that the SEC would get into the business of approving NASD sanctions and then imposing additional sanctions of its own. That would be more extreme than merely increasing the NASD sanctions -- a procedure flatly prohibited by the Act.

In the absence of legal support for this proposition, Jones argues that because Congress divided enforcement responsibilities between the NASD and the SEC, we may infer that both cannot initiate discipline for the same conduct. Implicit in this argument is the invitation that we find the functions and interests of the NASD and the SEC to be coterminous or even, in some aspect, in conflict. We could not make such a finding.

As we have already observed, the NASD is a private non-profit corporation regulated as a registered securities association. Under the Maloney Act, the NASD is authorized to regulate itself by prohibiting and preventing fraud and unethical conduct by its members and by promoting in them professionalism and technical proficiency, much as would any association of professionals seeking to better itself and instill confidence in the public. While its self-regulating powers are supervised by the SEC, which is essentially given a veto power over

15

NASD disciplinary action, that review power does not convert the NASD's interest to the same interest as that of the regulating agency. Even though the SEC's role in reviewing NASD action is essentially one of approval or disapproval, in its other roles, the SEC is given a larger responsibility as the government agency charged with executing the broad array of securities enactments. In short, the NASD's interest is that of a professional association charged with regulating itself, and the interest of the SEC is that of a policing agency that reviews NASD action and executes, in the public interest, the securities laws of the United States. There is nothing inherent in the SEC's dual role that suggests that the SEC's various functions are mutually exclusive. By giving the SEC a broad range of responsibilities and enforcement rights, Congress indicates just the contrary. The diverse statutory provisions authorizing SEC action confirm this conclusion.

Notwithstanding the SEC's broad authority, it nevertheless affirms that, as a matter of policy, it does not impose sanctions on NASD members when it determines that NASD sanctions are sufficient and that it initiates action on its own only when doing so is necessary in the "public interest."

In summary, the SEC has "pervasive oversight authority" over the NASD's disciplinary proceedings to ensure that they are conducted fairly, see Austin Mun. Sec., Inc. v. NASD, 757 F.2d 676, 690 (5th Cir. 1985), but it also has separate and distinct authority to execute the securities laws when it determines that the public interest requires it. We can find no provision that makes these roles mutually exclusive. Accordingly, we hold that the Maloney Act's limitations of the SEC's review over NASD disciplinary action do not constitute limitations on the SEC's other enforcement rights and obligations.

C

Jones' final argument in support of his claim of improper double liability is that the Fifth Amendment's Double Jeopardy Clause prohibits both penalization by the NASD and penalization by the SEC for the same conduct. While he acknowledges that both of the sanctions are denominated "remedial," he argues that in fact they constitute penalties within the meaning of the Double Jeopardy Clause. See United States v. Halper, 490 U.S. 435, 447-50 (1989). He asserts that the

16

$22,500 fine imposed by the NASD for failure to maintain $5,000 in net capital "can only be punitive, since the penalty is four times" the capital requirement. And he argues that the SEC's "banishment of Mr. Jones from the securities business is hardly remedial," explaining, "[i]f he is not associated with [the business] for two and one-half years, the firm -- and his sole source of income-- will cease to exist. Such a `death penalty' can only serve as retribution."

The government argues that the double jeopardy clause is not applicable (1) because the NASD is a private party and not a governmental agent and (2) because the SEC's sanctions are remedial rather than penal. We agree with the SEC on both points.

The Double Jeopardy Clause, which provides "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb," U.S. Const. amend. V, prohibits successive governmental criminal prosecutions and successive governmental punishments for the same conduct. See United States v. Hatfield , 108 F.3d 67, 68 (4th Cir. 1997). While the NASD is a closely regulated corporation, it is not a governmental agency, but rather a private corporation organized under the laws of Delaware. As such, it is highly questionable whether its disciplinary action of members, even if it is considered to be a quasi-public corporation, can implicate the Double Jeopardy Clause. As Judge Friendly has aptly observed, the Clause restricts conduct of the "government in the narrowest sense," and "[n]o private body, however close its affiliation with the government, can . . . subject a person" to double jeopardy. United States v. Solomon, 509 F.2d 863, 867 (2d Cir. 1975).

More clearly, however, Jones has not twice been subjected to penalties for the same conduct in the sense prescribed by the Double Jeopardy Clause. While the civil or remedial label imposed by the SEC on its sanctions of Jones is not necessarily determinative, if a sanction is so designated, Jones has the burden of presenting the "clearest proof . . . that the proceeding is not civil but criminal in nature." Hatfield, 108 F.3d at 70 (internal quotation omitted). To determine whether a sanction is civil or criminal, we look to (1) whether it is designated to be remedial and (2) whether the remedy provided, even if so designated, "is so unreasonable or excessive that it transforms what was clearly intended as a civil remedy into a crimi-

17

nal penalty." <u>One Lot Emerald Cut Stones v. United States</u>, 409 U.S. 232, 237 (1972); <u>see also United States v. Ursery</u>, 116 S. Ct. 2135, 2147 (1996); <u>United States v. One Assortment of 89 Firearms</u>, 465 U.S. 354, 362 (1984).

In this case, Jones has not carried the burden of demonstrating with the clearest proof that his suspension by the SEC was disproportionate to the benefits received by the government in protecting the public against the types of violations it found Jones to have committed. His conduct evidenced a serious disregard for investor protections and well could have led to substantial investor losses. That investors did not sustain losses does not alter the nature of the violations, nor does it reduce the serious risks that the SEC's suspension of Jones sought to correct. <u>See Blaise D'Antoni & Assoc. v. SEC</u>, 289 F.2d 276, 277 (5th Cir. 1961) (order revoking broker-dealer registration "is not punitive; it is not a penalty imposed on the broker . . . but a means to protect the public interest" (<u>citing Pierce v. SEC</u>, 239 F.2d 160, 163 (9th Cir. 1956) (denial of broker-dealer registration is a means to protect the public interest, and "is not to be regarded as a penalty imposed on the broker")). Accordingly, we conclude that the Double Jeopardy Clause does not bar the SEC's order in this case.

III

Jones also challenges the sufficiency of the evidence to support the finding of scienter and the illegal conduct related to it, and he contends that his 30-month suspension was "unduly harsh." We find no merit to either argument.

Jones argues that in connection with the Sidbury Offering, he honored the escrow account requirements by following the advice of counsel. He asserts that he never believed that anything he did was illegal, and he points to his own testimonial explanations to support that position. He overlooks, however, the testimony to the contrary that was given by his attorney, L. Bruce McDaniel. McDaniel testified that he advised Jones to set up a separate escrow agreement with the bank under which escrow proceeds would remain beyond Jones' control. McDaniel explained that the purpose for his recommendation was to shield the offering proceeds from self-dealing and to enable Jones & Ward Securities to continue in operation with the lower

18

$5,000 capital requirement. Jones concedes that he did not set up such an escrow account, but he maintains that he nevertheless honored all escrow requirements, about which the offering states:

> The first $192,000 of <u>sales proceeds</u> will be escrowed with United Carolina Bank of Wilmington, North Carolina. After $192,000 in stock has been sold, <u>those escrowed funds</u> will be released to the company. If less than $192,000 of stock is sold, <u>all escrowed funds</u> will be returned to subscribers, with interest.

(Emphasis added). The evidence shows that in July 1989 Jones withdrew $32,410 from the escrow account when it contained only $108,000. Jones argues, however, that he was not violating the offering provision because he had already obtained agreements from investors to purchase more than $192,000 worth of shares. Subscription agreements, however, do not equate to "proceeds" or "funds" as referred to in the offering.

In addition to handling the account contrary to the offering and the advice of counsel, Jones refused to follow the advice of his counsel when extending guarantees to certain investors in May 1989 when the offering was getting "a little sticky." He also refused to follow counsel's advice when he extended the offering beyond the closing date without again starting from scratch. And finally, Jones refused to follow the advice of counsel in using the proceeds of both the Sidbury and OVP Offerings for purposes other than specifically stated in the offerings.

As the SEC found, Jones "chose to disregard the terms of the offering materials and the advice of counsel. We think it clear that he acted with scienter." We agree that the SEC had evidence from which to make that finding. We are not in a position to make a contrary factual finding; rather, we must accept the SEC's findings when they are supported by substantial evidence. <u>See Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (citing <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)).

In arguing that the SEC's sanction was "unduly harsh," Jones argues that no investors suffered any loss and that no party other than

the NASD or the SEC ever complained about his conduct. He adds that he "did not embezzle, divert funds, or otherwise wrongfully profit from any of these activities" and he continues to maintain that he believed that "he had done nothing wrong." While Jones did in fact make good the losses to his investors, he fails to realize, even yet, that he misused investors' funds in the first place; that he treated investors differently; and that he subjected investors' funds to undisclosed risks, misleading them by what he promised he would do with their money. That no investor's money was actually lost is not the measure of his wrongdoing. Jones wilfully violated important rules of under-writing designed to protect investors. And if it were established that Jones continued to believe that these rules were sufficiently unimportant to follow in the future, the SEC would be justified in suspending him more permanently. With the evidence found, it suspended him only for a limited period. That sanction not only protects the investing public but clarifies to Jones that the provisions he violated cannot be relegated in his mind merely to obstructive operating requirements.

The public interest demands enforcement and compliance with the rules for fair disclosure, adequate operating capital, recordkeeping, and reporting in connection with securities offerings. We believe that the SEC acted well within the discretion conferred on it in sanctioning violations of the securities laws by the suspensions imposed in this case. See, e.g., Butz v. Glover Livestock Comm'n Co., 411 U.S. 182, 185-86 (1973) (holding that an agency's choice of sanction should be overturned only if "unwarranted in law or . . . without justification in fact"); Svalberg v. SEC, 876 F.2d 181, 185 (D.C. Cir. 1989) ("[A] court should not second-guess the judgment of the Commission in connection with the imposition of sanctions, unless the SEC has acted contrary to law, without basis in fact or in abuse of discretion.").

Accordingly, we affirm the SEC's order of October 10, 1995.

AFFIRMED

20