[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-16544

_____

D.C. Docket No. 1:14-cv-22739-JLK

U.S. COMMODITY FUTURES TRADING COMMISSION,

Plaintiff - Appellee,

versus

SOUTHERN TRUST METALS, Inc.,
LORELEY OVERSEAS CORPORATION,
ROBERT ESCOBIO,

Defendants - Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 12, 2018)

Before JORDAN, HULL, and GILMAN,* Circuit Judges.

_____

* Honorable Ronald Lee Gilman, United States Circuit Judge for the Sixth Circuit, sitting by designation.

GILMAN, Circuit Judge:

After reviewing the Defendants' Petition to Rehear, and having considered supplemental briefing by the parties, we vacate the original opinion in this case, *U.S. Commodity Futures Trading Comm'n v. Southern Trust Metals, Inc.*, 880 F.3d 1252 (11th Cir. 2018), and issue the following opinion in its place.  The Petition to Rehear is otherwise denied.

* * * *

This is a commodities-fraud case.  The U.S. Commodity Futures Trading Commission (CFTC) began investigating Southern Trust Metals, Inc., Loreley Overseas Corporation, and Robert Escobio (collectively, the Defendants) in response to a customer's complaint.  That complaint also prompted the National Futures Association (NFA)—a private, self-regulatory organization for the futures industry—to open an investigation, which proceeded in tandem with the CFTC's.

The NFA's investigation ended in a settlement.  Afterwards, the CFTC filed this lawsuit, alleging that the Defendants violated the Commodities Exchange Act (CEA) when they failed to register as futures commission merchants, transacted the purchase and sale of contracts for the future delivery of a commodity (futures) outside of a registered exchange, and promised to invest customers' money in precious metals (metals) but instead invested the funds in so-called "off-exchange

2

margined metals derivatives" (metals derivatives).  The district court, after a bench trial, entered judgment for the CFTC on all claims.

For the reasons set forth below, we **AFFIRM** the judgment of the district court except as to the restitution award for the group of investors whose losses were associated solely with the registration violations.  As to that portion of the restitution award, we **VACATE** the judgment and **REMAND** with instructions to consider other equitable remedies.

## I.  BACKGROUND

### A.    Factual background

Escobio is the Chief Executive Officer (CEO) and largest shareholder of the Southern Trust Securities Holding Corporation (Holding Corporation).  The Holding Corporation owns Loreley, a British Virgin Islands corporation, which in turn owns Southern Trust, a Florida corporation.  Escobio formed Southern Trust to provide commodities investment services, and he serves as its director and CEO.

Southern Trust represented that it was able to facilitate customers' investment in precious metals.  Its website and brochure stated that customers "can take physical possession of [their] metals in New York or London."  The company's brokers told customers much the same story—that the customers were purchasing metals stored in places like New York, London, and Hong Kong.  At least one of Southern Trust's brokers told customers that Southern Trust charged

3

"storage fees" for the metals.  To open a trading account at Southern Trust, customers completed an account-opening form containing language that "[p]hysical precious metals can either be delivered directly to the customer's designated point of delivery or to a recognized depository, which provides insured non-segregated storage."  Southern Trust also represented that it could loan customers money to purchase metals.

But Southern Trust did not in fact deal in metals; it dealt in metals derivatives.  Such contracts are a type of derivative investment.  Southern Trust, however, was not registered with the CFTC as a futures commission merchant and thus could not trade metals derivatives on registered exchanges.  So Escobio, through Loreley, engaged two foreign brokerages—Berkeley Futures Limited and Hantec Markets Limited—to handle the transactions.

Escobio opened trading accounts at Berkeley and Hantec in Loreley's name, not in the names of Southern Trust's customers.  The accounts were numbered, and Southern Trust maintained records linking its customers to the specific numbered accounts.

Opening these accounts required Escobio to review documents describing Berkeley's and Hantec's investment products.  One of Hantec's account-opening documents, the "Product Disclosure Statement," explains that "bullion trading" "operates in the same manner as foreign exchange trading" in that "[w]hat you are

4

actually buying is a [c]ontract" that "derives its value from" a "physical underlying asset" such as "Loco London Gold." That document's "Glossary" defines "Loco London Gold" to "mean[] not only that the gold is held in London but also that the price quoted is for delivery there." Elsewhere, the document explains that in "bullion trading," "[Hantec] do[es] not deliver the physical underlying assets (i.e. gold or silver) to you, and you have no legal right to it." The Berkeley documents similarly confirm that the account holder intends "to speculate in derivative products." None of the account-opening documents mention making loans for the purchase of metals.

After setting up the trading accounts at Berkeley and Hantec, Southern Trust sent its customers' money to Loreley, which in turn invested the funds, through Berkeley and Hantec, in metals derivatives. Escobio received monthly account statements showing that all investments were in metals derivatives, not metals. Those statements do not reflect any loans to Southern Trust's customers.

Southern Trust never informed its customers that their money was being transferred to Loreley, Berkeley, or Hantec. Nor did it inform customers who wished to invest in metals (the group comprising the vast majority of its customers) that their money was instead being invested in metals derivatives. Southern Trust still charged those customers interest on fictitious loans, which it falsely told them were made in order to facilitate their investment in metals.

5

After receiving a complaint from one of Southern Trust's customers, the NFA opened an investigation. Around the same time, Escobio asked Berkeley and Hantec about the nature of Loreley's investments. Escobio contended at trial that he did so simply to confirm his understanding that Loreley was investing in metals. The CFTC maintained, however, and the district court ultimately concluded, that Escobio had done so in anticipation of litigation, and that he had carefully framed his inquiries to elicit responses that would support the defense he later asserted— that he did not know that his customers' money was being invested in metals derivatives.

In response to Escobio's inquiry, Hantec's CEO said: "I can confirm that you hold accounts with us that only trade Silver Bullion." Hantec's CEO clarified at his deposition, however, that "Silver Bullion" is industry lingo for derivatives and that he could not have intended any other meaning because trading in "physical metals is not something that Hantec does."

A Berkeley employee similarly responded to Escobio's inquiry, writing that "all Loreley accounts with the prefix XILOR were silver bullion accounts" that "only traded in OTC [off-exchange] silver bullion and never traded any futures contracts." But Berkeley's CEO testified at his deposition that Berkeley had never delivered metals to any of its customers, including Loreley, nor stored any metals on their behalf. He also testified that, despite Escobio's contrary assertion, he

6

never told Escobio that the trades Berkeley handled for Loreley would lead to the storage of metals.

None of Southern Trust's investments led to the delivery of metals. Hantec's CEO testified that he told Escobio that Hantec could arrange for the delivery of metals, but that he did so only in response to a question about a hypothetical situation. According to Hantec's CEO, Escobio inquired in the abstract about Hantec's ability to arrange delivery: "It's an inquiry from a client. Robert [Escobio] did not tell me, 'I would like to deliver metal.' He asked me, 'If I wanted to deliver a metal, can you arrange it?' and I said, 'Let me go find out.'" Hantec's CEO continued: "I talked to . . . one of my contacts at Standard Chartered bank who gave me information and I went back to Robert and explained" that Hantec could arrange delivery. This response was memorialized in a letter to Escobio, stating that "any Gold or Silver you purchase from us is held for your account and upon full payment we are able to arrange delivery for you when requested." But the Defendants never asked Hantec to arrange delivery, and no delivery ever occurred.

The NFA's investigation ended in a settlement. Although the NFA's and the CFTC's investigators had cooperated with each other, their investigations were independent. The Defendants' settlement agreement with the NFA therefore does not mention the CFTC or the CFTC's investigation.

7

As the CFTC's investigation moved forward, the Defendants continued to produce documents in response to its requests. The Defendants' lawyers knew at the time of the NFA settlement that the CFTC might bring its own enforcement action, but they did not suggest to the CFTC or to anyone else that such an action would violate their settlement agreement with the NFA.

## B.    Procedural background

In July 2014, the CFTC filed its complaint, seeking equitable relief and penalties under the CEA. The complaint alleges that the Defendants engaged in two illegal schemes, which we will refer to as the "unregistered-futures scheme" and the "metals-derivatives scheme."

As to the unregistered-futures scheme, the complaint alleges that, even though the Defendants were not registered as futures commission merchants, they accepted money from customers who wished to invest in futures. Because the Defendants were unregistered, moreover, they could not trade futures on a registered exchange. They therefore sought to trade indirectly, through intermediaries. To that end, the Defendants funneled the customers' money through Loreley to foreign brokerage firms—Berkeley and Hantec—licensed to trade futures. Those brokerage firms made the actual investments.

As to the metals-derivatives scheme, the complaint alleges that the Defendants accepted money from customers who wished to invest in metals with

8

borrowed money.  But instead of issuing loans to those customers and investing their money in metals, the Defendants took the customers' money and invested it in metals derivatives.  No loans existed, but the Defendants charged loan interest anyway.

At the summary-judgment stage of the case, the parties filed dueling motions.  The district court granted the CFTC's motion in part, holding that the Defendants had conducted off-exchange transactions and had failed to register as futures commission merchants.  It denied the Defendants' motion in full, rejecting their affirmative defenses that (1) their settlement with the FTA equitably estopped the CFTC from bringing suit, and (2) they actually delivered metals so as to bring their transactions within an exception to the CEA's registration requirements.

The CFTC's fraud claim then proceeded to trial.  After a bench trial, the district court found that the Defendants had engaged in fraud, ordered them to pay restitution in the full amount of the customers' losses, and imposed fines.  The court also permanently enjoined the Defendants from employment in the commodities-trading industry.  On appeal, the Defendants challenge the court's rulings both on summary judgment and at trial.

## II.  ANALYSIS

### A.    Standard of review

On an appeal from a judgment in a bench trial, we review the district court's conclusions of law de novo.  *HGI Assocs., Inc. v. Wetmore Printing Co.*, 427 F.3d 867, 873 (11th Cir. 2005).  We also review de novo the district court's application of the law to the facts.  *United States v. Frank*, 599 F.3d 1221, 1228 (11th Cir. 2010).  The district court's findings of fact, on the other hand, are evaluated under the clear-error standard.  *HGI*, 427 F.3d at 873.  "We will not find clear error unless our review of the record leaves us 'with the definite and firm conviction that a mistake has been committed.'"  *Coggin v. Comm'r of Internal Revenue*, 71 F.3d 855, 860 (11th Cir. 1996) (quoting *United States v. Gypsum Co.*, 333 U.S. 364, 395 (1948)).  Finally, when the district court has issued a permanent injunction, we review the scope of the injunction under the abuse-of-discretion standard.  *Commodity Futures Trading Comm'n v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339, 1343 (11th Cir. 2008).

### B.    Equitable estoppel does not bar the CFTC's claims.

To start with, the Defendants challenge the district court's summary-judgment ruling that their settlement with the NFA does not preclude the CFTC's claims.  The district court held that equitable estoppel does not apply because (1) the Defendants do not dispute that the NFA is a private, nongovernmental

organization through which the commodities-trading industry regulates itself; (2) the CFTC was not a party to the settlement; and (3) settlements with private, nongovernmental organizations do not preclude subsequent claims by government regulators.

Although this circuit has not yet addressed whether a settlement between a nongovernmental regulator and a regulated company may preclude subsequent claims by the governmental regulator, the circuits that have addressed the issue have uniformly answered in the negative. *See, e.g.*, *Graham v. S.E.C.*, 222 F.3d 994, 1007 n.25 (D.C. Cir. 2000) ("Of course, even if the NASD had done something to bind itself, that would not have bound the SEC."); *Jones v. S.E.C.*, 115 F.3d 1173, 1179–81 (4th Cir. 1997) ("We have found no statutory, regulatory, or historical reference to support [the] argument that NASD discipline of its members was intended to preclude this disciplinary action by the SEC itself against a securities professional.").

In *Jones*, the Securities and Exchange Commission (SEC) brought administrative claims against a securities trader after the trader settled a claim by the National Association of Securities Dealers (NASD). 115 F.3d at 1180. The Fourth Circuit rejected the trader's argument that the settlement precluded the SEC's claims, reasoning that private and public regulators "represent distinct

11

interests" and "bring two separate vantage points to enforcement efforts—one from the industry itself and the other from the regulator." *Id.*

This outcome accords with the courts' general reluctance to apply principles of equitable estoppel to the government. "The Supreme Court has never established that the doctrine of equitable estoppel can be applied against the government and, in fact, has implied that it can not be." *Tovar-Alvarez v. U.S. Atty. Gen.*, 427 F.3d 1350, 1353–54 (11th Cir. 2005) (citing *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 422 (1990)). "[I]t is well settled that the [g]overnment may not be estopped on the same terms as any other litigant." *Heckler v. Cmty. Health Servs. of Crawford Cty.*, 467 U.S. 51, 60 (1984).

This circuit has repeatedly opined that, even assuming that equitable estoppel could apply against the government, "it would require a showing of affirmative misconduct on the government's part." *Tovar-Alvarez*, 427 F.3d at 1354; *see also Sanz v. U.S. Sec. Ins. Co.*, 328 F.3d 1314, 1319–20 (11th Cir. 2003) ("[E]ven if estoppel is available against the Government, it is warranted only if affirmative and egregious misconduct by government agents exists.").

The present case is analogous to *Jones*. Here, the uncontradicted evidence shows that the NFA, like the NASD, is a private, nongovernmental organization and that the CFTC was not a party to the Defendants' settlement with the NFA. The record, moreover, contains no evidence of affirmative misconduct by the

government.    So even if equitable estoppel theoretically could apply to the government, it does not apply here.

A second, independent ground also exists for affirming the district court's denial of summary judgment based on the Defendants' estoppel defense:    the record reflects a genuine dispute of material fact regarding the element of reasonable reliance.  *See Heckler*, 467 U.S. at 59 (noting that "the party claiming the estoppel must have relied on its adversary's conduct" and that the "reliance must have been reasonable").  Especially noteworthy is the fact that the settlement agreement makes no mention of the CFTC or its investigation, so the Defendants' purported reliance lacks a textual basis.  The only language in the agreement that even arguably suggests reliance is a clause providing that the agreement "shall resolve and terminate all complaints, investigations and audits relating to [the Defendants]."

But interpreting this language to embrace the CFTC's investigation is unreasonable.  For one thing, the notion that the NFA would agree to terminate investigations outside of its control—and that the Defendants would accept such an unfulfillable obligation as consideration for their own concessions—defies common sense.  Further, a literal interpretation of "all complaints, investigations and audits relating to [the Defendants]" would impose on the Defendants obligations that they surely did not intend, such as the obligation to terminate their

13

own routine, internal accounting audits. Such audits would, after all, be "audits relating to [the Defendants]."

The lack of textual support for the Defendants' estoppel argument creates a genuine dispute concerning the *reasonableness* of their reliance. At the same time, other evidence creates a genuine dispute about whether there was any reliance at all. First, the Defendants continued to produce documents in response to requests from the CFTC's investigators after the settlement. This fact tends to negate any reliance because the Defendants presumably would not have continued cooperating with the CFTC if they had truly believed that their settlement with the NFA had terminated the CFTC's investigation. Second, the Defendants' lawyers, while preparing to defend against the present action, never suggested to the CFTC or anyone else that an action brought by the CFTC might violate the Defendants' settlement agreement with the NFA. For these reasons, we find no error in the district court's denial of the Defendants' motion for summary judgment based on the affirmative defense of equitable estoppel.

**C.    Summary judgment in favor of the CFTC on its claims for registration violations was appropriate.**

We now turn to the merits of this case. The CEA imposes registration requirements on commodities traders and the exchanges where they trade. Section 6d of the CEA makes it "unlawful for any person to be a futures commission merchant unless . . . such person shall have registered [as such] . . .

14

with the [CFTC]."    7 U.S.C. § 6d(a)(1).    The statute also requires that all transactions be "conducted on or subject to the rules of a board of trade which has been designated or registered by the [CFTC]."    *Id.* § 6(a).    Together, these provisions require that only registered traders handle transactions and that they do so on a registered exchange.

An exception exists, however, for transactions that result in "actual delivery within 28 days."    *Id.* § 2(c)(2)(D)(ii)(III)(aa).    Actual delivery means "giving real and immediate possession" of the commodity "to the buyer or the buyer's agent." *U.S. Commodity Futures Trading Comm'n v. Hunter Wise Commodities, LLC*, 749 F.3d 967, 979 (11th Cir. 2014) (internal quotation marks omitted).    "'Actual' is that which 'exist[s] in fact' and is 'real,' rather than constructive."    *Id.* (quoting *Black's Law Dictionary* 494 (9th ed. 2009)).

This exception is an affirmative defense on which the commodities trader bears the burden of proof.    *See Schlemmer v. Buffalo, R & P R Co*, 205 U.S. 1, 10 (1907) (explaining that the "general rule of law is[] that a proviso carves special exceptions only out of the body of the act; and those who set up any such exception must establish it"); *see also Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97 (1974) ("[T]he application of an exemption under the Fair Labor Standards Act is a matter of affirmative defense on which the employer has the burden of proof."); *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 590 (11th Cir.

1994) ("[T]he exceptions granted within the EPA constitute affirmative defenses.").

The Defendants concede that they were not registered as futures commission merchants and that the trades at issue did not occur on a registered exchange. But they seek refuge in the exception for transactions resulting in actual delivery.

As set forth in the factual background of this opinion, however, there is no basis in the record for the Defendants' contention that actual delivery ever occurred. The record instead supports the holding of the district court that the Defendants failed to establish their affirmative defense of "actual delivery." *See Hunter Wise Commodities*, 749 F.3d at 979. We therefore find no error in the court's grant of summary judgment in favor of the CFTC on its claims that the Defendants engaged in off-exchange transactions and failed to register as futures commission merchants.

**D.    The district court did not err in concluding that the Defendants committed fraud under 7 U.S.C. §§ 6b(a) and 9, and under 17 C.F.R. § 180.1.**

We next turn to the issue of fraud. For our purposes, 7 U.S.C. § 6b(a), 7 U.S.C. § 9, and 17 C.F.R. § 180.1 are redundant. Section 6b(a) makes it "unlawful . . . for any person . . . in connection with . . . any contract of sale of any commodity . . . for future delivery . . . to cheat or defraud or attempt to cheat or defraud the other person . . . [or] willfully to make . . . any false report or statement

. . . [or] willfully to deceive or attempt to deceive the other person by any means whatsoever."    7 U.S.C. §§ 6b(a).    Section 9 of the same chapter is similar, providing that "[i]t shall be unlawful for any person . . . to use . . . in connection with any . . . contract of sale of any commodity . . . for future delivery . . . any manipulative or deceptive device or contrivance."  *Id.* § 9(1).  Finally, 17 C.F.R. § 180.1(a) declares it "unlawful for any person . . . in connection with any . . . contract of sale of any commodity . . . or contract for future delivery . . . to intentionally or recklessly . . . use . . . any manipulative device, scheme, or artifice to defraud; . . . [or] [m]ake . . . any untrue or misleading statement of a material fact or to omit to state a material fact necessary . . . to make the statements made not untrue or misleading; . . . [or] [e]ngage . . . in any act . . . which operates . . . as a fraud or deceit upon any person."

The CFTC must prove the same three elements to establish liability under each of the above provisions:  "(1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; and (3) materiality."  *Commodity Futures Trading Comm'n v. R.J. Fitzgerald & Co., Inc.*, 310 F.3d 1321, 1328 (11th Cir. 2002).  "Unlike a cause of action for fraud under the common law of [t]orts, 'reliance' on the representations is not a requisite element . . . ."  *Id.* at n.6.

17

### 1. *Misrepresentation, misleading statement, or deceptive omission*

The district court's factual findings on the "misrepresentation" element reflect no clear error. With the many references to "physical metals," "physical possession," and "storage," Southern Trust's brochure, website, brokers, and account-opening documents collectively represented that the company offered investments in metals. Abundant evidence shows, however, that after accepting the customers' money, Southern Trust sent the funds to Loreley, which in turn sent them to Berkeley and Hantec for investment in metals derivatives. The Defendants do not dispute that the accounts at Berkeley and Hantec were in Loreley's name, not in the names of Southern Trust's customers. Moreover, the evidence shows that Southern Trust never informed its customers that their money was being transferred to Loreley, Berkeley, or Hantec and, consequently, that the customers did not know that those firms held their money.

The district court correctly applied the law to these facts. "Whether a misrepresentation has been made depends on the 'overall message' and the 'common understanding of the information conveyed.'" *R.J. Fitzgerald*, 310 F.3d at 1328 (quoting *Hammond v. Smith Barney Harris Upham & Co.*, Comm. Fut. L. Rep. (CCH) 36,657 & n.12 (CFTC Mar. 1, 1990)). We find the case of *U.S. Commodity Futures Trading Commission v. Hunter Wise Commodities, LLC*, 21 F. Supp. 3d 1317 (S.D. Fla. 2014), squarely on point. The district court in

*Hunter Wise* concluded, after a bench trial, that the defendant "misrepresented facts about the precious metals transactions it oversaw" and provided a deceptive "'overall message'" when it "led the retail customers to believe metals were stored on their behalf." *Id.* at 1338 (quoting *R.J. Fitzgerald*, 310 F.3d at 1328). Moreover, the court found that the defendant "failed to inform [the retail customers] that the metals it purchased were on a financed basis, it did not own the metals, and the metals, if there were any at all, were not in the retail customers' names." *Id.*; *see also U.S. Commodity Futures Trading Comm'n v. Hunter Wise Commodities, LLC*, 749 F.3d 967, 980–82 (11th Cir. 2014) (affirming the district court's issuance of a preliminary injunction because the CFTC presented a prima facie case of fraud under 7 U.S.C. § 6b).

Southern Trust orchestrated a nearly identical scheme in the present case. It misrepresented to customers the fundamental nature of their investments, telling them that they were investing in metals when in fact they were investing in metals derivatives, and charging a fictitious storage fee despite the customers having no metals to store. Finally, Southern Trust failed to tell the customers that it passed their money through Loreley to Berkeley and Hantec, with the customers having no knowledge of or relationship with these entities. The district court therefore did not err in concluding that the CFTC satisfied its burden, under the preponderance-of-the-evidence standard, to prove the first element necessary to establish fraud.

19

## 2. *Scienter*

Regarding the element of scienter, Escobio does not dispute that he was the CEO of both Southern Trust and the Holding Corporation, and that he had substantial prior experience in commodities trading. He also does not dispute that he signed the account-opening documents for Loreley's trading accounts at both Berkeley and Hantec. Those documents, as well as the monthly account statements that Escobio received, make clear that Loreley was investing the customers' money in metals derivatives, not metals. Further, Escobio knew that the accounts at Hantec and Berkeley bore Loreley's name, not the names of Southern Trust's customers. Based on these facts, the district court did not clearly err in finding that Escobio knew that he was investing his customers' money in metals derivatives.

Nor did the district court clearly err in finding that Escobio knew that Berkeley and Hantec did not make any loans to Southern Trust's customers, even though Southern Trust charged its customers interest on the purported loans. Neither the account-opening documents nor the monthly statements from Berkeley or Hantec reflect any loans from those companies. Moreover, the Defendants point to no evidence—other than Escobio's uncorroborated testimony—of any loans from Berkeley or Hantec, and the district court discounted Escobio's testimony on that point, as on others, because it determined that he lacked credibility. This

circuit applies a "strong rule of deference" in reviewing a district court's determination of a witness's credibility at a bench trial. *Childrey v. Bennett*, 997 F.2d 830, 834 n.5 (11th Cir. 1993). Given this standard, as well as the numerous conflicts between Escobio's testimony and the documentary evidence, the court was entitled to find that Escobio lacked credibility and to discount his testimony accordingly.

The district court also correctly applied the law to these facts. "[S]cienter is established if Defendant intended to defraud, manipulate, or deceive, or if Defendant's conduct represents an extreme departure from the standards of ordinary care." *Commodity Futures Trading Comm'n v. R.J. Fitzgerald & Co., Inc.*, 310 F.3d 1321, 1328 (11th Cir. 2002). Adapting "federal securities law" to the commodities-fraud context, this circuit has stated that scienter is shown "when Defendant's conduct involves 'highly unreasonable omissions or misrepresentations . . . that present a danger of misleading [customers] which is either known to the Defendant or so obvious that Defendant must have been aware of it.'" *Id.* (quoting *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001)).

The evidence shows that the Defendants either intended to mislead Southern Trust's customers or made highly unreasonable misrepresentations that posed an obvious danger of misleading them. Escobio's deep involvement in managing

21

Loreley's accounts at Berkeley and Hantec, as well as his extensive industry experience, support the inference that he knew that he was investing his customers' money in metals derivatives. Hantec's CEO, at his deposition, put it this way: "Under no circumstance is [it] plausible" that Escobio believed that he was trading in metals. Escobio also surely knew that Berkeley and Hantec had made no loans to Southern Trust's customers and, therefore, that the customers were being charged interest on loans that did not exist. The district court thus did not err in concluding that the CFTC had proved scienter.

### 3. Materiality

This brings us to the third and final element—materiality. "A representation or omission is 'material' if a reasonable investor would consider it important in deciding whether to make an investment." *Fitzgerald*, 310 F.3d at 1328–29. The Defendants' briefing on this element addresses only the materiality of their omission that the customers' money would pass through Loreley to Berkeley and Hantec. If that were the only omission or misrepresentation in this case, we might need to examine the materiality element more closely. But other misrepresentations found by the district court easily qualify as material. The Defendants, for example, represented that they were investing customers' money in metals when in fact they were investing it in metals derivatives. Moreover, the Defendants represented that customers owed interest on loans used to purchase

22

metals, but no such loans existed. A reasonable investor would consider each of these misrepresentations important in deciding whether to invest. Accordingly, the district court did not err in concluding that these misrepresentations were material. We therefore agree with the district court's overall conclusion that fraud was established under 7 U.S.C. §§ 6b(a) and 9, and under 17 C.F.R. § 180.1.

**E.    The district court did not err in permanently enjoining the Defendants from employment in the commodities-trading industry.**

Turning now to the propriety of the injunction issued against the Defendants, we note that a district court's issuance of an injunction is reviewed under the abuse-of-discretion standard. *Commodity Futures Trading Comm'n v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339, 1347 (11th Cir. 2008) (applying this standard to a permanent injunction issued under the CEA). "[S]o long as [the district court's] decision does not amount to a clear error of judgment[,] we will not reverse even if we would have gone the other way had the choice been ours to make." *S.E.C. v. ETS Payphones, Inc.*, 408 F.3d 727, 733 (11th Cir. 2005).

"[U]pon a proper showing," the CEA allows a district court to grant "a permanent or temporary injunction." 7 U.S.C. § 13a-1(b). "'[T]he ultimate test [for an injunction] is whether the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future.'" *Wilshire*, 531 F.3d at 1346 (quoting *SEC v. Caterinicchia*, 613 F.2d 102, 105 (5th Cir. 1980)). This test entails weighing the following six factors:

the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations.

*SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1322 (11th Cir. 1982).  A court need not make a finding on every factor.  *See Wilshire*, 531 F.3d at 1346–47 (holding that a district court that considered only three of the six factors did not abuse its discretion in issuing an injunction).

Escobio argues that the injunction should be vacated because the district court, in weighing the *Carriba Air* factors, erred in not concluding that his cooperation with the NFA's investigation resolved the last three factors in his favor.  But the court had discretion in how to interpret Escobio's cooperation with the NFA.  This discretion would have allowed the court, for example, to interpret Escobio's cooperation not as contrition, but as a self-interested effort to strike a favorable deal with the NFA and, perhaps, to avoid criminal prosecution.  Escobio's denial of wrongdoing at his deposition, at trial, and throughout the NFA's and the CFTC's investigations further belies his acceptance of responsibility.  The same is true of his attempt to deflect blame onto Berkeley and Hantec, which he claims duped him into trading metals derivatives.  In sum, the court applied the correct legal standard, and its factual findings contain no clear error.  We therefore find no fault in its issuance of a permanent injunction.

24

**F.    Restitution is proper only for losses sustained in the metals-derivatives scheme, not for losses sustained in the unregistered-futures scheme.**

This brings us to the final issue in this case—restitution.  The district court awarded restitution for losses arising from both schemes.  First, it awarded $1,543,892 for losses sustained in the metals-derivatives scheme, in which the Defendants accepted customers' money for investment in metals but instead invested the funds in metals derivatives.  Second, the court awarded $559,725 for losses sustained in the unregistered-futures scheme, in which the Defendants accepted customers' money for investment in futures—and actually invested the funds in futures through Loreley's accounts at Berkeley and Hantec—but failed to register as futures commission merchants or to conduct the transactions on a registered exchange.  The Defendants challenge both awards, arguing that the CFTC failed to prove, as required by the CEA, that the Defendants' violations of the CEA proximately caused the customers' losses.

### 1. The district court relied on a definition of proximate cause subsequently rejected by the Supreme Court.

Under the CEA, a "court may impose . . . on any person found in the action to have committed any violation[] equitable remedies including . . . restitution to persons who have sustained losses proximately caused by such violation (in the amount of such losses)."  7 U.S.C. § 13a-1(d)(3).  This statutory language, by its terms, permits restitution only for losses proximately caused by a violation.

25

In its restitution analysis, the district court concluded that the "Defendants' violations proximately caused their customers' losses" because those losses "were a reasonably foreseeable result of the Defendants' violations." The court derived this foreseeability-based formulation of proximate cause from a relatively recent decision of this court holding that, for proximate cause to exist under the Fair Housing Act (FHA), "[t]he defendant must have been reasonably able to foresee the kind of harm that was actually suffered." *See City of Miami v. Bank of Am. Corp.*, 800 F.3d 1262, 1282 (11th Cir. 2015).

That decision, however, was subsequently reversed by the Supreme Court in *Bank of America Corp. v. City of Miami*, 137 S. Ct. 1296 (2017). The Court concluded that, "[i]n the context of the FHA, foreseeability alone does not ensure the close connection that proximate cause requires" between the complained-of conduct and the alleged harm. *Id.* at 1306. As the Court explained, the FHA incorporates the concept of proximate cause developed at common law, where "directness principles" apply. *Id.* Proximate cause under the FHA thus "requires 'some direct relation between the injury asserted and the injurious conduct alleged.'" *Id.* (quoting *Holmes v. Sec. Inv'r Protection Corp.*, 503 U.S. 258, 268 (1992)). Such a "direct relation" usually does not exist "beyond the first step" in a causal chain. *Id.* (quoting *Hemi Group, LLC v. City of New York, N.Y.*, 559 U.S. 1, 10 (2010)).

26

We have found no circuit court opinion examining proximate cause under the CEA, but the statute surely demands more than foreseeability alone. Section 13a-1(d)(3) of the CEA, like the FHA provision examined in *Bank of America*, "sounds basically in tort" because it defines a new legal duty and authorizes the courts to award compensation for injuries caused by a defendant's wrongful breach. *See Curtis v. Loether*, 415 U.S. 189, 195 (1974) (explaining why a damages action under the Civil Rights Act of 1964 "is analogous to a number of tort actions recognized at common law").

Congress, moreover, has given no indication, either in the CEA's text or otherwise, that it intended to depart from the common-law conception of proximate cause. *See Bank of America*, 137 S. Ct. at 1305 ("We assume Congress 'is familiar with the common-law rule and does not mean to displace it *sub silentio*' in federal causes of action." (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1390 (2014))). We thus conclude that the common-law rules governing proximate cause apply here.

Those rules begin with the notion that proximate cause necessarily encompasses *cause in fact*, requiring proof of "but-for" causation. W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 30 (5th ed. 1984). Establishing *proximate cause* requires more. *See Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1350 (11th Cir. 2016) ("Unable to establish even but-for causation, such a plaintiff

necessarily would be unable to meet the higher burden of showing that the racketeering activity proximately caused the plaintiff's injuries."); *Hemi Grp.*, 559 U.S. at 12 ("Our precedents make clear that in the RICO context, the focus [when assessing proximate cause] is on the directness of the relationship between the conduct and the harm.").

This does not mean, however, that the fraud must be the "sole and exclusive cause" of the loss; it means only that the fraud must be a "substantial" or "significant contributing cause." *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1309 (11th Cir. 2011) (citing *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997)). The wrongdoer, in other words, can be held liable to the plaintiff even if the wrongful act was not the sole cause of the loss. *See, e.g.*, *Staub v. Proctor Hosp.*, 562 U.S. 411, 420 (2011) (recognizing that "it is common for injuries to have multiple proximate causes").

Concepts such as "directness" and "foreseeability," moreover, should not distract us from the fact that "[p]roximate cause is bottomed on public policy as a limitation on how far society is willing to extend liability for a defendant's actions." *See Ashley County v. Pfizer, Inc.*, 552 F.3d 659, 671 (8th Cir. 2009). As the Supreme Court has explained, "[t]he term 'proximate cause' is shorthand for a concept: Injuries have countless causes, and not all should give rise to legal liability." *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 692 (2011) (emphasis

omitted).   "'What we . . . mean by the word "proximate[]"' . . . is simply this: '[B]ecause of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point.'"  *Id.* at 692–93 (quoting *Palsgraf v. Long Island R. Co.*, 162 N.E. 99, 103 (N.Y. 1928) (Andrews, J., dissenting)).  Accordingly, "the question whether a court will sustain a finding of proximate cause under a given set of circumstances is as much a question of public policy as it is of direct causality."  *Gathercrest, Ltd. State Bank of India v. First Am. Bank & Tr.*, 805 F.2d 995, 997 (11th Cir. 1986) (citing *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982)).

### 2. *The district court erred in finding that the registration violation alone proximately caused any loss.*

With regard to the unregistered-futures scheme, the district court's finding of proximate cause rested on the premise that the Defendants' "business was illegal from the outset" and that the Defendants "never should have accepted customer funds for the purpose of trading futures transactions without first registering as a futures commission merchant with the CFTC."  The court reasoned that because the transactions were illegal, the losses were foreseeable.

But such reasoning, without more, conflates correlation with causation.  As a general matter, losing money is a foreseeable result of investing with an unregistered trader, but this is not because a trader's failure to register will itself inevitably cause a loss.  More likely, any loss will result from some other factor,

29

such as the trader's incompetence or dishonesty, which the failure to register might correlate with but not cause. The intrinsic qualities of the trader—not his or her failure to register—would be the likely cause of the loss, to say nothing of market fluctuations.

Consider the analogous circumstance of a client being represented by an unlicensed lawyer. The lawyer's lack of a license might indicate incompetence or a lack of integrity, but normally it will not in and of itself cause a client's loss in court. Indeed, a client might well prevail in court despite the lawyer's unlicensed status. Or, if there is a loss, the loss might flow from factors wholly unrelated to the lawyer's status, such as an unfavorable precedent, a judicial error, or a jury's caprice.

A recent decision from this court illustrates the point that a fraudster's failure to observe registration requirements does not necessarily cause his victim's loss. In *Alvarez v. United States*, 862 F.3d 1297, 1300 (11th Cir. 2017), a group of federal employees sued the defendant for negligence per se after he sold them fraudulent, unregistered securities. The court rejected the plaintiffs' argument that the seller's failure to register the securities had caused the plaintiffs' losses, concluding instead that their losses had occurred because the securities were fraudulent. This point was made in the following passage:

> As the district court correctly explained, "had the FEBG Bond Fund been legitimate, the fact of its being unregistered would have had no

30

effect on plaintiffs. And conversely, if McLeod had registered the fraudulent securities (lying about them to do so since they didn't exist), plaintiffs would still have suffered the same harm. Plaintiffs' injuries flow from the securities and McLeod's representations which underlay them being fraudulent, not because they were unregistered."

*Id.* at 1302 (quoting the district court's opinion).

The same logic applies here. In the unregistered-futures scheme, the Defendants invested their customers' money in futures through Loreley's accounts at Berkeley and Hantec. The customers who lost money in this scheme intended to invest in futures, and the CFTC does not dispute that the Defendants in fact facilitated the investments that those customers wished to make. According to the district court, the Defendants' only CEA violations in the unregistered-futures scheme were their failure to register as futures commission traders and their failure to disclose the roles of Berkeley, Hantec, and Loreley in making the investments.

The record contains no evidence, however, that the customers who lost money in the unregistered-futures scheme did so because of these violations. As in *Alvarez*, there has been no showing that the registration violations caused the losses. Nor has the CFTC pointed to any evidence that the losses flowed from the Defendants' omissions regarding the roles of Berkeley, Hantec, or Loreley. The CFTC has not shown, for instance, that the customers who intended to invest in futures would have refrained from doing so if they had known of Berkeley's, Hantec's, or Loreley's involvement. Nor has the CFTC shown that those entities'

31

involvement delayed the execution of trades or otherwise caused the investors to receive anything less than what they had bargained for.  Finally, the record does not show that any of the futures investors lost money as a result of the NFA requiring the Defendants to liquidate the accounts at Berkeley and Hantec.

Because the CFTC did not prove that the Defendants' violations in the unregistered-futures scheme caused any loss, we vacate the restitution award related to that scheme and remand the issue to the district court with instructions to consider whether any other equitable remedy is appropriate.  We particularly note the statutory subsection under which the court may order the disgorgement of gains, in appropriate circumstances, without regard to proximate cause. *See* 7 U.S.C. § 13a-1(d)(3) ("[T]he court may impose . . . on any person found . . . to have committed any violation[] equitable remedies including . . . disgorgement of gains received in connection with such violation.").  The district court may, but need not, consider on remand whether disgorgement is appropriate in the present case.

### 3. *Sufficient evidence supports the award of restitution for losses sustained in the metals-derivatives scheme.*

The district court did not err, however, in awarding restitution for customer losses in the metals-derivatives scheme, in which the Defendants promised to invest their customers' money in metals but instead invested it in metals derivatives.  Several victims of this scheme testified at trial that they would not

32

have invested with Southern Trust if they had known that their money would be passed through Loreley and invested in metals derivatives rather than in actual metals. Moreover, victims of this scheme lost substantial sums when the NFA, having determined that the Defendants were violating commodities-trading laws, forced Loreley's accounts at Berkeley and Hantec (which corresponded to customer accounts at Southern Trust) to be liquidated.

The Defendants fault the NFA for forcing them to liquidate the accounts at an inopportune moment, when the metals markets were down. Accordingly, the Defendants argue that the NFA's action, along with market conditions, are intervening causes that broke the chain of proximate causation.

Without question, intervening causes must be considered in assessing proximate cause. The Supreme Court has recognized that "changed economic circumstances" are among the "intervening causes" that can limit a wrongdoer's responsibility. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 812–13 (2011). Similarly, the Court has recognized that a third party's actions can "break[] the chain of causation." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 659 (2008). This court has applied these principles as well. *See, e.g.*, *United States v. Stein*, 846 F.3d 1135, 1155–56 (11th Cir. 2017) (ordering the district court to consider, in assessing proximate cause on remand, whether widespread "short selling" of a company's stock and "the across-the-board stock market decline of

33

2008" "affected [the company]'s stock price during the fraudulent period and, if so, whether [those occurrences] nonetheless were reasonably foreseeable" to the defendant).

But in a relatively recent case analogous to the one before us, the Supreme Court rejected the argument that the Defendants make here. In *Robers v. United States*, 134 S. Ct. 1854 (2014), the Court considered the effect of a declining market on the proximate-cause analysis used to determine a fraudster's restitution obligation. The defendant in that case was convicted of submitting fraudulent loan applications to two banks, which extended him mortgage-backed loans based on the fraudulent applications. *Id.* at 1856. When the defendant failed to make the required mortgage payments, the banks foreclosed on the mortgages and took title to two houses, which they subsequently sold in a falling real estate market. *Id.* Both banks suffered a loss. *Id.* The district court ordered the defendant to pay restitution in the full amount of the banks' losses, even though the value of the houses when the mortgages were created more than covered the loan balances. *Id.*

On appeal, the defendant argued that "where, as here, a victim receives less money from a later sale than the collateral was worth when received, the market and not the offender is the proximate cause of the deficiency." *Id.* at 1859. A unanimous Supreme Court was "not convinced." *Id.* It reasoned as follows:

> The basic question that a proximate cause requirement presents is "whether the harm alleged has a sufficiently close connection to the

34

conduct" at issue. Here, it does. Fluctuations in property values are common. Their existence (though not direction or amount) is foreseeable. And losses in part incurred through a decline in the value of collateral sold are directly related to an offender's having obtained collateralized property through fraud. That is not to say that an offender is responsible for everything that reduces the amount of money a victim receives for collateral. Market fluctuations are normally unlike, say, an unexpected natural disaster that destroys collateral or a victim's donation of collateral or its sale to a friend for a nominal sum—any of which . . . could break the causal chain.

*Id.* (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1390 (2014)). Based on this reasoning, the Court concluded that the defendant's fraudulent loan applications proximately caused the banks' losses. *Id.* The Court therefore affirmed the judgment imposing restitution in the full amount of the deficiency. *Id.*

We find *Robers* applicable here because it involved an analogous situation: A defendant—in *Robers*, the loan applicant; here, Southern Trust—fraudulently obtained investments. (From a bank's perspective, a loan is a kind of investment. *See American Bank & Trust Co. v. Wallace*, 702 F.2d 93, 97 (6th Cir. 1983) ("In one sense every lender of money is an investor since he places his money at risk in anticipation of a profit in the form of interest." (quoting *C.N.S. Enters., Inc. v. G & G Enters., Inc.*, 508 F.2d 1354, 1359 (7th Cir. 1975))).) Upon the fraud's discovery, what remained of the investments—in *Robers*, the collateral; here, the metals derivatives—was sold. The sales took place in a declining market, so the investors lost money.

In the present case, the fraud is even more closely connected to the investors' losses than in *Robers* because the customers here had no choice, upon the fraud's discovery, about when or even whether to divest. The NFA required the metals-derivatives accounts to be liquidated, and the customers' losses were then "locked in." That the customers here were individuals, not sophisticated commercial entities as in *Robers*, makes the case for proximate cause even stronger.

We see no conflict between the Supreme Court's reasoning in *Robers* and the well-established principle in certain securities-fraud cases that market conditions must be considered in determining whether a fraudster has proximately caused a loss. Although the Defendants argue that the CFTC must show "loss causation" in this case, all of the authorities cited by the Defendants involve "fraud on the market," which is a kind of fraud that is materially different from the fraud here.

In a typical fraud-on-the-market case, the defendant is alleged to have artificially inflated the price of a security with misrepresentations or omissions that, when later revealed, caused the price of the security to drop. An important hurdle for the plaintiff in such cases is the element of loss causation, which numerous courts have likened to proximate cause. *See, e.g.*, *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1309 (11th Cir. 2011) (explaining that "loss

36

causation" requires proof that the fraud is the "proximate cause of the plaintiff's later losses"); *Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 550 (8th Cir. 2008) ("Loss causation . . . corresponds to the common law's requirement of proximate causation."); *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 209 (2d Cir. 2000) ("Loss causation is causation in the traditional 'proximate cause' sense . . . .").

The loss-causation concept deals with whether a security's price drop is attributable to the fraud rather than to some extraneous factor. In the fraud-on-the-market context, the Supreme Court has recognized that, rather than being the result of fraud, a security's price drop

> could instead be the result of other intervening causes, such as "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events." If one of those factors were responsible for the loss or part of it, a plaintiff would not be able to prove loss causation to that extent. This is true even if the investor purchased the stock at a distorted price, and thereby presumptively relied on the misrepresentation reflected in that price.

*Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 812–13 (2011) (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342–43 (2005)).

Teasing out the effect of market conditions in fraud-on-the-market cases is essential because the fraud alleged involves a manipulation of stock price. The effect of the fraud must therefore be distinguished from the effects of independent market forces in order to determine how much of the price drop should be

37

attributed to the defendant. Here, in contrast, the fraud at issue is not a fraud on the market, but rather a fraud on individual consumers who wished to invest in metals and instead had their funds placed in metals derivatives. The present case involves no allegation, in other words, that the Defendants manipulated the price of a commodity. So there is no need to ask, as we would in a fraud-on-the-market case, whether the Defendants' fraud, rather than independent market forces, caused the victims' losses.

The factual question of whether fluctuations in the value of metals derivatives mirror fluctuations in the value of the underlying commodities is therefore beside the point. In *Robers*, the Supreme Court concluded that the fraudster proximately caused the banks' losses even though the banks received precisely the collateral that they had bargained for. Presumably, the banks would have suffered the same losses if they had foreclosed on the loans for a reason other than the fraud. Yet this did not negate proximate cause. By the same token, even if the value of the metals derivatives in this case precisely tracked the value of the underlying commodities—a fact that, in any event, is not established by the record—the Defendants' fraud would still be a proximate cause of the victims' losses.

Returning to the indicia of proximate cause, we conclude that the fraud here is directly related to the customers' losses because Southern Trust took their

38

money and, contrary to their wishes, invested it in metals derivatives. Furthermore, the Defendants' fraud is what prompted the NFA to intervene and, in an effort to prevent further losses, to require that Loreley's accounts at Berkeley and Hantec be liquidated.

As in *Robers*, the market conditions that contributed to the customers' losses were foreseeable. *See Robers*, 134 S. Ct. at 1859. Those conditions, therefore, do not constitute an intervening cause. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 420 (2011) ("A cause can be thought 'superseding' only if it is a 'cause of independent origin that was not foreseeable.'" (quoting *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837 (1996))). Nor does the NFA's action constitute an intervening cause under the facts of this case. *See id.*

This brings us back to a bedrock policy question: Who should be responsible for the customers' losses? *See supra* at 28–29. The Defendants' argument that their fraud was not a proximate cause of their customers' losses is untenable not only as a matter of law and fact, but also as a matter of public policy. *See United States v. Turk*, 626 F.3d 743, 750 (2d Cir. 2010) (rejecting a similar argument because it would "encourage would-be fraudsters to roll the dice on the chips of others, assuming all of the upside benefit and little of the downside risk"). Adopting such an argument would create perverse incentives for commodities traders and undermine the purpose of the CEA. We thus find no error in the

district court's restitution award for losses sustained in the metals-derivatives scheme.

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court except as to the restitution award for the group of investors whose losses were associated solely with the registration violations.  As to that portion of the restitution award, we **VACATE** the judgment and **REMAND** with instructions to consider other equitable remedies.

40