(Slip Opinion) OCTOBER TERM, 2013 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ROBERS *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 12–9012.  Argued February 25, 2014—Decided May 5, 2014

Petitioner Robers was convicted of a federal crime for submitting fraudulent mortgage loan applications to two banks.  On appeal, he argued that the District Court had miscalculated his restitution obligation under the Mandatory Victims Restitution Act of 1996, 18 U. S. C. §§3663A–3664, a provision of which requires property crime offenders to pay "an amount equal to . . . the value of the property" less "the value (as of the date the property is returned) of any part of the property that is returned," §3663A(b)(1)(B).  The District Court had ordered Robers to pay the difference between the amount lent to him and the amount the banks received in selling the houses that had served as collateral for the loans.  Robers claimed that the District Court should have instead reduced the restitution amount by the value of the houses on the date the banks took title to them since that was when "part of the property" was "returned."  The Seventh Circuit rejected Robers' argument.

*Held*: The phrase "any part of the property . . . returned" refers to the property the banks lost, namely, the money they lent to Robers, and not to the collateral the banks received, namely, the houses.  Read naturally, the words "the property," which appear seven times in §3663A(b)(1), refer to the property that was lost as a result of the crime, here, the money.  Because "[g]enerally, 'identical words used in different parts of the same statute are . . . presumed to have the same meaning,'" *Merrill Lynch, Pierce, Fenner & Smith Inc.* v. *Dabit*, 547 U. S. 71, 86 (quoting *IBP, Inc.* v. *Alvarez*, 546 U. S. 21, 34), "the property . . . returned" must also be the property lost as a result of the crime.  Any awkwardness or redundancy that comes from substituting an amount of money for the words "the property" is the linguistic price paid for having a single statutory provision that covers

different kinds of property. Since valuing money is easier than valuing other types of property, the natural reading also facilitates the statute's administration.

Robers' contrary arguments are unconvincing. First, other provisions of the statute, see, *e.g.,* §§3664(f)(2), (3)(A), (4), seem to give courts adequate authority to avoid Robers' false dichotomy of having to choose between refusing to award restitution and requiring the offender to pay the full amount lent where a victim has not sold the collateral by the time of sentencing. Second, for purposes of the statute's proximate-cause requirement, see §§3663A(a)(2), 3664(e), normal market fluctuations do not break the causal chain between the offender's fraud and the losses incurred by the victim. Third, even assuming that the return of collateral compensates lenders for their losses under state mortgage law, the issue here is whether the statutory provision, which does not purport to track state mortgage law, requires that collateral received be valued at the time the victim received it. Finally, the rule of lenity does not apply here. See *Muscarello* v. *United States*, 524 U. S. 125, 139. Pp. 3–7.

698 F. 3d 937, affirmed.

BREYER, J., delivered the opinion for a unanimous Court. SO-TOMAYOR, J., filed a concurring opinion, in which GINSBURG, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 12–9012

BENJAMIN ROBERS, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[May 5, 2014]

JUSTICE BREYER delivered the opinion of the Court.

The Mandatory Victims Restitution Act of 1996 requires certain offenders to restore property lost by their victims as a result of the crime. 18 U. S. C. §3663A. A provision in the statue says that, when return of the property lost by the victim is "impossible, impracticable, or inadequate," the offender must pay the victim "an amount equal to . . . the value of the property" less "the value (as of the date the property is returned) of any part of the property that is returned." §3663A(b)(1)(B). The question before us is whether "any part of the property" is "returned" when a victim takes title to collateral securing a loan that an offender fraudulently obtained from the victim.

We hold that it is not. In our view, the statutory phrase "any part of the property" refers only to the specific property lost by a victim, which, in the case of a fraudulently obtained loan, is the money lent. Therefore, no "part of the property" is "returned" to the victim until the collateral is sold and the victim receives money from the sale. The import of our holding is that a sentencing court must reduce the restitution amount by the amount of money the victim received in selling the collateral, not the value of

the collateral when the victim received it.

## I

The relevant facts, as simplified, are the following:  In 2005 petitioner Benjamin Robers, acting as a straw buyer, submitted fraudulent loan applications to two banks.  The banks lent Robers about $470,000 for the purchase of two houses, upon which the banks took mortgages.  When Robers failed to make loan payments, the banks foreclosed on the mortgages.  In 2006 they took title to the two houses.  In 2007 they sold one house for about $120,000.  And in 2008 they sold the other house for about $160,000.  The sales took place in a falling real estate market.

In 2010 Robers was convicted in federal court of conspiracy to commit wire fraud.  See §§371, 1343.  He was sentenced to three years of probation.  And the court ordered him to pay restitution of about $220,000, roughly the $470,000 the banks lent to Robers less the $280,000 the banks received from the sale of the two houses (minus certain expenses incurred in selling them).

On appeal Robers argued that the sentencing court had miscalculated his restitution obligation.  In his view, "part of the property" was "returned" to the banks when they took title to the houses.  And, since the statute says that "returned" property shall be valued "as of the date the property is returned," the sentencing court should have reduced the restitution amount by more than $280,000: $280,000 was what the banks received from the sale of the houses, but since the banks sold the houses in a falling real estate market, the houses had been worth more when the banks took title to them.

The Court of Appeals rejected Robers' argument.  698 F. 3d 937 (CA7 2012).  And, because different Circuits have come to different conclusions about this kind of matter, we granted Robers' petition for certiorari.  Compare *id.*, at 942 (case below) (restitution obligation reduced

by money received from sale of collateral), with *United States* v. *Yeung*, 672 F. 3d 594, 604 (CA9 2012) (restitution obligation reduced by value of collateral at time lender took title).

## II

In our view, the phrase "any part of the property . . . returned" refers to the property the banks lost, namely, the money they lent to Robers, and not to the collateral the banks received, namely, the two houses. For one thing, that is what the statute says. The phrase is part of a long sentence that reads as follows:

> "(b) The order of restitution shall require that [the] defendant—
>
> "(1) in the case of an offense resulting in damage to or loss or destruction of property of a victim of the offense—
>
> "(A) return *the property* to the owner of *the property* . . . ; or
>
> "(B) if return of *the property* under subparagraph (A) is impossible, impracticable, or inadequate, pay an amount equal to—
>
> "(i) the greater of—
>
> "(I) the value of *the property* on the date of the damage, loss, or destruction; or
>
> "(II) the value of *the property* on the date of sentencing, less
>
> "(ii) the value (as of the date *the property* is returned) of any part of *the property* that is returned . . . ." §3663A (emphasis added).

The words "the property" appear seven times in this sentence. If read naturally, they refer to the "property" that was "damage[d]," "los[t]," or "destr[oyed]" as a result of the crime. §3663A(b)(1). "Generally, 'identical words used in different parts of the same statute are . . . presumed to have the same meaning.'" *Merrill Lynch, Pierce, Fenner &*

*Smith Inc.* v. *Dabit*, 547 U. S. 71, 86 (2006) (quoting *IBP, Inc.* v. *Alvarez*, 546 U. S. 21, 34 (2005)). And, if the "property" that was "damage[d]," "los[t]," or "destr[oyed]" was the money, then "the property . . . returned" must also be the money. Money being fungible, however, see, *e.g.*, *Ransom* v. *FIA Card Services, N. A.*, 562 U. S. ___, ___ (2011) (slip op., at 17); *Sabri* v. *United States*, 541 U. S. 600, 606 (2004), "the property . . . returned" need not be the very same bills or checks.

We concede that substituting an amount of money, say, $1,000, for the words "the property" will sometimes seem awkward or unnecessary as, for example:

> "[I]f return of [$1,000] . . . is impossible, . . . pay an amount equal to . . . the greater of . . . the value of [$1,000] on the date of the . . . loss . . . or . . . the value of [$1,000] on the date of sentencing . . . ." §3663A(b)(1)(B).

But any such awkwardness or redundancy is the linguistic price paid for having a single statutory provision that covers property of many different kinds. The provision is not awkward as applied to, say, a swindler who obtains jewelry, is unable to return all of the jewelry, and must then instead pay an amount equal to the value of all of the jewelry obtained less the value (as of the date of the return) of any of the jewelry that he did return. It directs the court to value the returned jewelry as of the date it was returned and subtract that amount from the value of all of the jewelry the swindler obtained. As applied to money, the provision is in part unnecessary but reading the statute similarly does no harm. And the law does not require legislators to write extra language specifically exempting, phrase by phrase, applications in respect to which a portion of a phrase is not needed.

The natural reading also facilitates the statute's administration. Many victims who lose money but subsequently

receive other property (*e.g.*, collateral securing a loan) will sell that other property and receive money from the sale. And often that sale will take place fairly soon after the victim receives the property. Valuing the money from the sale is easy. But valuing other property as of the time it was received may provoke argument, requiring time, expense, and expert testimony to resolve.

We are not convinced by Robers' arguments to the contrary. First, Robers says that, when a victim has not sold the collateral by the time of sentencing, our interpretation will lead to unfair results. A sentencing court will have only two choices, both undesirable. The court will either have to refuse to award restitution, thereby undercompensating the victim, or have to require the offender to pay the full amount lent to him, thereby giving the victim a windfall.

In our view, however, the dilemma is a false one. Other provisions of the statute allow the court to avoid an undercompensation or a windfall. Where, for example, a sale of the collateral is foreseen but has not yet taken place, the court may postpone determination of the restitution amount for two to three months after sentencing, thereby providing the victim with additional time to sell. See §3664(d)(5). Where a victim receives, say, collateral, but does not intend to sell it, other provisions of the statute may come into play. Section 3664(f)(2) provides that upon

"determination of the amount of restitution owed to each victim, the court shall . . . specify in the restitution order the manner in which, and the schedule according to which, the restitution is to be paid."

Section 3664(f)(3)(A) says that a

"restitution order may direct the defendant to make a single, lump-sum payment, partial payments at specified intervals, in-kind payments, or a combination of payments at specified intervals and in-kind

payments."

And §3664(f)(4) defines "in-kind payment" as including "replacement of property." These provisions would seem to give a court adequate authority to count, as part of the restitution paid, the value of collateral previously received but not sold. Regardless, Robers has not pointed us to any case suggesting an unfairness problem. And the Government has conceded that the statute (whether through these or other provisions) provides room for "credit[s]" against an offender's restitution obligation "to prevent double recovery to the victim." Brief for United States 30 (emphasis deleted).

Robers also points out, correctly, that the statute has a proximate cause requirement. See §3663A(a)(2) (defining "victim" as "a person *directly and proximately* harmed as a result of the commission of" the offense (emphasis added)); §3664(e) (Government bears the "burden of demonstrating the amount of the loss sustained by a victim *as a result of* the offense" (emphasis added)). Cf. *Paroline* v. *United States*, *ante,* at 6–11. And Robers argues that where, as here, a victim receives less money from a later sale than the collateral was worth when received, the market and not the offender is the proximate cause of the deficiency.

We are not convinced. The basic question that a proximate cause requirement presents is "whether the harm alleged has a sufficiently close connection to the conduct" at issue. *Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*, *ante,* at 14. Here, it does. Fluctuations in property values are common. Their existence (though not direction or amount) is foreseeable. And losses in part incurred through a decline in the value of collateral sold are directly related to an offender's having obtained collateralized property through fraud. That is not to say that an offender is responsible for everything that reduces the amount of

money a victim receives for collateral. Market fluctuations are normally unlike, say, an unexpected natural disaster that destroys collateral or a victim's donation of collateral or its sale to a friend for a nominal sum—any of which, as the Government concedes, could break the causal chain. See Tr. of Oral Arg. 25–27, 38–39, 46, 50–51.

Further, Robers argues that "principles" of state mortgage law "confirm that the return of mortgage collateral compensates a lender for its losses." Brief for Petitioner 30. But whether the collateral compensates a victim for its losses is not the question before us. That question is whether the particular statutory provision at issue here requires that collateral received be valued at the time the victim received it. That statutory provision does not purport to track the details of state mortgage law. Thus, even were we to assume that Robers is right about the details of state mortgage law, we would not find them sufficient to change our interpretation.

Finally, Robers invokes the rule of lenity. To apply this rule, we would have to assume that we could interpret the statutory provision to help an offender like Robers, who is hurt when the market for collateral declines, without harming other offenders, who would be helped when the market for collateral rises. We cannot find such an interpretation. Regardless, the rule of lenity applies only if, after using the usual tools of statutory construction, we are left with a "grievous ambiguity or uncertainty in the statute." *Muscarello* v. *United States*, 524 U. S. 125, 139 (1998) (internal quotation marks omitted). Having come to the end of our analysis, we are left with no such ambiguity or uncertainty here. The statutory provision refers to the money lost, not to the collateral received.

\* \* \*

For these reasons, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–9012

_____

## BENJAMIN ROBERS, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SEVENTH CIRCUIT

[May 5, 2014]

JUSTICE SOTOMAYOR, with whom JUSTICE GINSBURG joins, concurring.

I join the opinion of the Court. I write separately, however, to clarify that I see its analysis as applying only in cases where a victim intends to sell collateral but encounters a reasonable delay in doing so. See *ante,* at 5–6 (explaining that where a victim "does not intend to sell" collateral, "other provisions of the statute may come into play," enabling a court "to count, as part of the restitution paid, the value of collateral previously received but not sold"). If a victim chooses to hold collateral rather than to reduce it to cash within a reasonable time, then the victim must bear the risk of any subsequent decline in the value of the collateral, because the defendant is not the proximate cause of that decline.

Here, although the banks did not immediately sell the homes they received as collateral, Robers did not adequately argue below that their delay reflected a choice to hold the homes as investments.* Such an argument would

_____

*Before the District Court, Robers suggested precisely the opposite: that the banks had sold the homes too hastily, at fire-sale prices in a falling market. See App. 35 ("The drop in value could have been due to the housing market itself, or due to the victim's rush to cut their losses with the properties and take whatever price they could get at a sheriff's sale, regardless of whether the sale price reflected the fair market value of the property at the time"). Before the Seventh Circuit, Robers did

likely have been fruitless, because the delay appears consistent with a genuine desire to dispose of the collateral. Real property is not a liquid asset, which means that converting it to cash often takes time. See, *e.g.,* 698 F. 3d 937, 947 (CA7 2012) ("[R]eal property is not liquid and, absent a huge price discount, cannot be sold immediately"). And indeed, the delays here appear to have resulted from illiquidity. See App. 70 (one of the two homes was placed on the market but did not immediately sell); *id.,* at 89 (the other attracted no bids at a foreclosure sale). Because such delays are foreseeable, it is fair for Robers to bear their cost: the diminution in the homes' value. See *ante,* at 6 (analysis of proximate causation).

In other cases, however, a defendant might be able to show that a significant delay in the sale of collateral evinced the victim's choice to hold it as an investment rather than reducing it to cash. Suppose, for example, that a bank received shares of a public company as collateral for a fraudulently obtained loan. "Common stock traded on a national exchange is . . . readily convertible into cash," *Reves* v. *Ernst & Young*, 494 U. S. 56, 69 (1990), so if the bank waited more than a reasonable time to sell the shares, a district court could infer that the bank was not really trying to sell but instead was holding the shares as investment assets. If the shares declined in value after the bank chose to hold them, it would be wrong for the court to make the defendant bear that loss. As the

--------

suggest that the banks should have sold more quickly. See Brief for Appellant in No. 10–3794, p. 35 ("[T]here is no 'loss causation' here, . . . because the kind of loss that occurred (due to the market, or to the victims holding the property longer than they should have in a declining market, or to other unknown factors) was not the kind for which the defendant's acts could have controlled or accounted"). But this argument does not imply that the banks' delay reflected a choice to hold the homes as investments, only that the banks misjudged the timing of the sales.

Government acknowledged at oral argument, a victim's choice to hold collateral—rather than selling it in a reasonably expeditious manner—breaks the chain of proximate causation. See, *e.g.,* Tr. of Oral Arg. 38–39, 44–45. If the collateral loses value after the victim chooses to hold it, then that "part of the victim's net los[s]" is "attributable to" the victim's "independent decisions." *Id.,* at 39. The defendant cannot be regarded as the "proximate cause" of that part of the loss, *ibid.,* and so cannot be made to bear it.

   In such cases, I would place on the defendant the burden to show—with evidence specific to the market at issue—that a victim delayed unreasonably in selling collateral, manifesting a choice to hold the collateral. See 18 U. S. C. §3664(e) (burden to be allocated "as justice requires"). Because Robers did not sufficiently argue below that the banks broke the chain of proximate causation by choosing to hold the homes as investments, and because the delay encountered by the banks appears to have been reasonable, it is fair for Robers to bear the cost of that delay. I therefore join the Court in affirming the restitution order.