In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 19-1734 & 19-1745

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHARNPAL GHUMAN and AGA KHAN,

*Defendants-Appellants.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:13-cr-00816 — **John J. Tharp, Jr.**, *Judge.*

ARGUED APRIL 7, 2020 — DECIDED JULY 16, 2020

Before ROVNER, HAMILTON, and BARRETT, *Circuit Judges*.

ROVNER, *Circuit Judge.* Charnpal "Paul" Ghuman and Aga
Khan participated in a multi-million dollar bank fraud scheme
in which they helped to create fraudulent loan applications in
order to convince a bank to issue mortgages to unqualified
individuals who were purchasing gasoline stations from them.
Both men pleaded guilty to one count of bank fraud, *see* 18

U.S.C. § 1344; Ghuman also pleaded guilty to one count of filing a false tax return, *see* 26 U.S.C. § 7206. Ghuman challenges the district court's decision to deny him credit for acceptance of responsibility, *see* U.S.S.G. § 3E1.1, and the imposition of a three-year term of supervised release on his false tax return conviction. Khan challenges the restitution he was ordered to pay. We affirm with one correction to Ghuman's sentence.

## I.

Defendants Ghuman and Khan were among several individuals who perpetrated a scheme to defraud American Enterprise Bank ("AEB") beginning in 2006 and lasting until 2009. The two men had become friends in high school and eventually went into business together. Initially, they were partners in a chain of cell phone stores, and then they expanded their investments to include gas stations. Khan devoted the majority of his time to managing the cell phone stores, whereas Ghuman primarily managed the gas stations. Beginning in 2006, they began to "flip" gas stations: acquiring the stations and then re-selling them at a profit. As the scheme developed, Ghuman would line up a buyer for a given station before he and Khan had even purchased that station.

The charged scheme involved the resale of some 44 gas stations in the Midwest to buyers whom Ghuman and Khan had recruited. The buyers were in a number of instances purchasing multiple stations (at Ghuman's urging), and yet they lacked the financial wherewithal to qualify for the loans necessary to make these purchases. Knowing that their buyers would not be approved for loans based on the facts, Ghuman and Khan relied on the cooperation of their co-defendant, AEB

loan officer Akash Brahmbhatt (to whom they gave cash, automobiles, and airline tickets as inducement), to arrange for the loans based on fraudulent documentation as to the buyers' income, assets, and contributions of equity to the transactions. Brahmbhatt, for example, after obtaining a buyer's personal identifying information, would typically prepare a personal financial statement, management resume, and personal history that contained false information about the buyer's financial assets, citizenship status, education, and work history—all designed to make the buyer look more qualified for loans than he or she was in fact. Similarly, Ghuman in some instances prepared falsified bank statements inflating the buyer's cash holdings to submit in support of the loan applications. And when Ghuman was selling a number of Kum & Go gas stations, he fashioned a set of financial statements for those stations out of whole cloth after Brahmbhatt told him the limited available data on those stations was insufficient. In one or more instances, Ghuman also created fraudulent subordination agreements, signed by non-existent gas station landlords, purporting to give the bank priority in payments from the stations. Finally, co-defendant Shital Mehta, an accountant, prepared fictitious (never-filed) tax returns inflating the buyers' income (typically to a range of $50,000 to $60,000) that were likewise submitted to the bank.[1]

The loans were guaranteed by the Small Business Administration, and a material condition of the loans was that the

---

[1] Mehta incorporated some of the business entities that took title to the purchased stations and also performed payroll and tax services for certain of the buyers.

buyers provide a certain amount of equity through down payments. The submitted loan paperwork made it appear (falsely) that the buyers had the funds to make these contributions. In some instances, Ghuman scanned, electronically altered, and then re-printed checks (occasionally checks that the buyers had previously tendered for other purposes) to make it look as though the buyers were supplying the funds, when in fact no such equity was ever provided. In other instances, Khan and Ghuman provided the equity payments themselves, and recouped the funds when the sales closed. In these instances, gift letters were prepared indicating (falsely) that the buyers had received the equity funds as gifts from relatives.

Where buyers were acquiring multiple gas stations, they were encouraged to find family members and friends who would co-sign and guarantee the loans. (In some instances, Ghuman recruited his own relatives for this role.) These individuals were then designated as the nominal buyers of the stations, although they had no genuine intent to own, possess, or run the stations. They were, for all intents and purposes, sham buyers. False documentation was then prepared to make it appear as though these individuals had the requisite wherewithal to qualify for the loans.

When the loans were issued and the gas stations were sold to the buyers, Khan and Ghuman split the proceeds of each sale, which of course were funded by the loans from AEB. AEB ultimately issued more than $38 million in loans as part of the scheme.

Not surprisingly, given the limited financial resources and experience of the buyers, the loans went into arrears before

long. The buyers were typically able to make loan payments for a year or two (in some instances with help from Ghuman) before defaulting.

The scheme came to an end in late 2008-early 2009 when the SBA began auditing the AEB loans and the FBI began looking into suspected bank fraud. AEB ultimately incurred a loss in excess of $14 million from the scheme.

Shortly after they learned from Brahmbhatt in April 2009 that an AEB employee had been interviewed by the FBI, Khan and Ghuman fled to India. Neither of them returned to the U.S. until 2011. Although both men deny having any substantial assets in India, it appears possible that they might. There is evidence that they discussed moving $2 million in funds to India in advance of their flight. And personal financial statements that Ghuman prepared in 2008 and 2009 indicated that he had more than $2 million in bank accounts there and that he owned two properties valued at more than $7.5 million. R. 297-12. Likewise, Khan informed the government in his proffer that he and Ghuman had invested in properties in India, including an apartment building.

Khan and Ghuman were indicted in 2013. Both were charged with multiple counts of bank fraud, in violation of 18 U.S.C. § 1344, and bank bribery, in violation of 18 U.S.C. § 215; Ghuman was also charged with filing a false tax return, in violation of 26 U.S.C. § 7206. Khan cooperated with the government and ultimately pleaded guilty to one count of bank fraud (Count 18) in connection with a $331,000 loan by AEB to finance the 2008 purchase of a gas station in New Boston, Illinois. Ghuman pleaded guilty to another count of bank fraud

(Count 1) in connection with a $744,000 loan by AEB to finance the 2007 purchase of a gas station in McComb, Illinois. Ghuman also pleaded guilty to one count of filing a false tax return (Count 23) which substantially understated his income for the calendar year 2006.

At sentencing, the district court denied Ghuman credit for acceptance of responsibility pursuant to Guidelines section 3E1.1, reasoning that Ghuman had both failed to admit his central role in the bank fraud scheme and falsely denied conduct manifesting that role. The court ordered Ghuman to serve a below-Guidelines prison term of 66 months on the bank fraud charge and a concurrent term of 36 months on the false tax return charge, along with concurrent three-year terms of supervised release on each of those charges. The court ordered Khan to serve a 36-month term in prison, followed by a three-year term of supervised release. After finding that AEB had suffered a loss, for restitution purposes, of $14.3 million,[2] the court also ordered Ghuman to pay $11.8 million and Khan to pay $10.8 million in restitution, $9.8 million of which was a joint and several obligation.

---

[2] In a separate calculation to determine the defendants' offense level pursuant to U.S.S.G. § 2B1.1, the court put the net loss to AEB at $8.4 million. That calculation gave the defendants the full benefit of the market value of the collateral that had been returned to the bank at the time of sentencing, regardless of whether the collateral had been sold.

**II.**

A. *Ghuman – acceptance of responsibility.*

Application note 3 to section 3E1.1 provides that "[e]ntry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which he is accountable under section 1B1.3 (Relevant Conduct) (*see* Application Note 1(A)) will constitute significant evidence of acceptance of responsibility." Ghuman argues, in essence, that because he truthfully admitted the acts underlying the bank fraud charge to which he pleaded guilty and acknowledged his participation in the overall scheme to defraud the bank, his lawyer admitted that he played a central and essential role in that scheme, and he did not falsely deny any aspect of that offense or any relevant conduct, he was entitled to a two-level credit for acceptance of responsibility. But given the extent to which Ghuman affirmatively downplayed his role in the bank fraud scheme and denied culpability for certain aspects of the fraud, the district court committed no clear error in finding that Ghuman had not genuinely accepted responsibility.

Judge Tharp gave a lengthy and detailed account, occupying 18 pages of the sentencing transcript, explaining why he was denying the section 3E1.1 reduction. Judge Tharp stressed that although Ghuman, in pleading guilty, had admitted that he was part of the scheme to defraud the bank, the only specific conduct he took responsibility for was supplying false information regarding the source of the equity payments in the loan underlying the count to which he pleaded

guilty. That was enough to establish his guilt on that charge, but not his full role in the scheme.

> [I]t is absolutely clear to the Court that Mr. Ghuman was at the center of this scheme. He was, if you will, driving the car. Mr. Ghuman, along with Mr. Khan, were the principal beneficiaries of this scheme … . It's very doubtful that this crime would have occurred, at least not on this scale, but for the actions of Mr. Ghuman.

R. 423 at 26–27. Ghuman was not required to affirmatively admit relevant conduct, Judge Tharp agreed, but the scope of the fraudulent scheme and Ghuman's role in it were matters encompassed by the offense to the crime of conviction. Ghuman's attorney represented to the court that Ghuman *did* acknowledge being an integral and major player in the broader scheme, and if that were true, the judge agreed, Ghuman would be entitled to credit for acceptance of responsibility. But it was not true: Ghuman had made no real acknowledgment of the conduct that made him a central figure in the scheme, and had, in fact, falsely denied much of that conduct.

Judge Tharp cited a range of actions that Ghuman had taken in furtherance of the scheme. These included:

- recruiting potential buyers, whom he "pushed and convinced and enticed and cajoled" to acquire multiple gas stations (R. 423 at 33);

- recruiting straw buyers as needed for the loans;

- coaching buyers to take the steps necessary to obtain their loans;

- providing false bank statements on behalf of the buyers;

- creating the fraudulent equity checks to make it appear that buyers were complying with SBA requirements;

- recruiting Mehta to prepare fictitious income tax returns;

- with Khan, bribing Brahmbhatt with "boxes of cash" and automobiles (R. 423 at 36);

- providing buyers with the names of corporate entities that would take ownership of the gas stations, and assigning relatives as guarantors of the loans; and

- discussing the destruction of evidence.

R. 423 at 30–38. These were the actions that exemplified Ghuman's central role in the scheme.

Yet, Ghuman's statements to the Probation Officer and to the Court, while paying lip service to his guilt, "backpedal[ed] and backpedal[ed] and backpedal[ed]" in terms of his relative culpability and the specific actions he took in furtherance of the scheme. R. 423 at 29. His version of the offense was "emblematic of the problem." R. 423 at 24. Not until 12 pages into that document was there a discussion of what Ghuman was responsible for. A substantial portion of the document was devoted to arguing that the bank bore substantial responsibility

for the success of the scheme. Judge Tharp acknowledged that there was "plenty of blame to go around," and that the bank indeed bore some responsibility. R. 423 at 26. Yet, the bank had not operated in bad faith, and it had in place controls and checks that the defendants had made efforts to work around. More to the point, Ghuman's version of the offense attempted to minimize his own culpability by portraying himself as more of a diffident, go-along participant in the fraud who did not think it was his business to tell Brahmbhatt and his other co-schemers it was wrong to use fraudulent information in order to secure the SBA loan guarantees. But "[t]his *was* his business. He was the one bringing these folks to Mr. Brahmbhatt to get the loans." R. 423 at 29 (emphasis ours). Similarly, Ghuman had told the Probation Officer that it "took [him] a while to understand that this was a huge criminal act" (R. 423 at 31) when Ghuman was a driving force behind the fraud. Apart from minimizing his role, Ghuman had also falsely denied a number of actions attributed to him by others: including recruiting buyers, altering documents, and suggesting the use of straw buyers. And, ultimately, he had fled to India for more than a year after the FBI began interviewing witnesses to the fraudulent scheme.

Judge Tharp acknowledged that Ghuman had expressed remorse, and had made some preliminary payments toward his restitution obligation. On the other hand, his affidavit concerning his assets raised questions and was not, in the judge's view, a full and truthful accounting of his holdings. Ultimately, the judge concluded, Ghuman had not fully acknowledged either his degree of culpability or the scope of harm that his actions had caused.

Given the record, Judge Tharp was more than justified in reaching this conclusion.[3] A defendant merits a reduction pursuant to Guidelines section 3E1.1 when he "clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). Truthfully admitting the conduct underlying the offense of conviction will go some way toward establishing a defendant's acceptance of responsibility; a defendant is not required to admit relevant conduct beyond the offense of conviction, so long as he does not "falsely den[y] or frivolously contest[ ]" such conduct. *Id.* comment. (n.1(A)). But a timely admission of guilt does not alone entitle a defendant to credit for acceptance of responsibility; it may, in the end, be outweighed by other conduct that is inconsistent with a genuine acceptance of culpability for the crime one has committed. *Id.*

Ghuman pleaded guilty to the commission of bank fraud in violation of § 1344, a key element of which is a scheme to defraud the bank. *United States v. LeBeau*, 949 F.3d 334, 341 (7th Cir. 2020), *pet'n for cert. filed* (U.S. June 26, 2020) (No. 19-1424); *United States v. Ajayi*, 808 F.3d 1113, 1119 (7th Cir. 2015). That same scheme underlay all 19 counts of bank fraud alleged in the indictment, and although Ghuman pleaded guilty to only one of those counts (the others would constitute relevant conduct, *see* U.S.S.G. § 1B1.3, comment. (nn. 3, 5(B)), the district court could reasonably expect Ghuman to acknowledge his role

---

[3] Given the detail and care with which the judge articulated his findings on this point, Ghuman's suggestion that the court did not adequately explain his decision to deny him credit for acceptance of responsibility is a non-starter.

in that scheme. *See United States v. Jones*, 52 F.3d 697, 701 (7th Cir. 1995) ("the district court was on solid ground in denying that reduction once it found that Jones had not fully admitted the extent of her participation in the fraudulent scheme") (collecting cases); *United States v. Ali*, 619 F.3d 713, 720 (7th Cir. 2010) ("blaming someone else for one's own actions or minimizing one's involvement in the offense is not the sort of genuine contrition the acceptance of responsibility reduction seeks to reward"); *United States v. Fiore*, 178 F.3d 917, 925–26 (7th Cir. 1999) ("Sentencing courts must look beyond formalistic expressions of culpability and determine whether the defendant has manifested an acceptance of responsibility for his offense in a moral sense."); *United States v. Zaragoza*, 123 F.3d 472, 480–81 (7th Cir. 1997), *retreated from on other grounds*, *United States v. Blaylock*, 413 F.3d 616, 620–21 (7th Cir. 2005); *United States v. Pitz*, 2 F.3d 723, 732 (7th Cir. 1993). Put another way, the district court was not requiring Ghuman to admit conduct beyond the offense of conviction: The overall scheme to defraud the bank, and Ghuman's role in that scheme, were part and parcel of the charge of bank fraud to which he pleaded guilty.

Ghuman relies on his attorney's statement that Ghuman "admits that he was an integral, a major player in this scheme, no question about that" (R. 453 at 173) as proof that he *did* acknowledge his role in the scheme; but we cannot fault the district court for finding the attorney's statement insufficient to constitute a genuine acknowledgment of Ghuman's culpability. Ghuman's own statements, as we discuss below, were inconsistent with an admission that Ghuman was an instigator and central player in the scheme. Moreover, as Judge Tharp

pointed out, Ghuman expressly (and falsely) denied a number of the actions that made him an integral part of the scheme.

Judge Tharp aptly characterized Ghuman's version of the offense as being "emblematic of the problem here." R. 423 at 24. The first 11 pages of that version are devoted to the bank, highlighting AEB's "egregious" judgment (R. 423 at 87) in re-hiring Brahmbhatt (after he briefly worked in 2007 for another bank) and promoting him to the head of the SBA loans division and faulting the bank for not having the oversight and safeguards in place that might have defeated the scheme Brahmbhatt and the other defendants perpetrated. Only after that take-down of AEB does Ghuman turn to his own wrongdoing. Ghuman admits that he participated in a plan to use fraudulent information to secure SBA guarantees, "even though he knew it was illegal." R. 347 at 99. He admits knowing that some gas station purchasers were submitting loan applications that included false information, that he signed statements indicating that the buyers were providing equity in the purchased stations when he knew they were not, and that in some instances, he provided the equity from his own funds to give the false appearance that the buyers were providing the required equity. R. 347 at 99–100. Ghuman then goes on to dispute certain aspects of the government's version of the offense, asserting that it "vastly overstates Ghuman's role in this scheme and minimizes the conduct of others—particularly Brahmbhatt." R. 347 at 100. Ghuman specifically denies that he recruited two of the buyers, Ish Oberoi and Mohammad Ali, that he altered documents and falsified loan applications, or advised others to use straw buyers (including their family members). Finally, ending where

he began, Ghuman goes so far as to assert it was "unlikely AEB relied on the information Brahmbhatt and others submitted when issuing the loans in question, " and that although Ghuman and his co-defendants were guilty of a crime, the true victim of that crime was the SBA rather than AEB. R. 347 at 101.

We reject Ghuman's assertion that the district court misunderstood and mischaracterized his version of the offense. Certainly it is true, as Ghuman has been at pains to point out, that AEB was culpable for the nearly blind faith it placed in Brahmbhatt and for its failure to more aggressively monitor the SBA loan approval process. But the *fraud* was one perpetrated by Ghuman and his cohorts, not the bank. At best, Ghuman's account of the scheme represents an incomplete acknowledgment of Ghuman's role in the offense. Beyond acknowledging Ghuman's guilty knowledge that false information was being given to the bank, the only actions in furtherance of the scheme that he admits are signing statements indicating the buyers of the gas stations were contributing the requisite equity to the purchases and that in some instances Ghuman was funding those equity checks himself. Much more exposition in Ghuman's version is devoted to blaming the bank for mismanaging its affairs in such a way that opened the door to the success of the scheme that Ghuman and his co-defendants perpetrated. Ghuman, of course, bore the burden of demonstrating to the district court that he accepted moral responsibility for his criminal activity. *E.g.*, *United States v. Smith*, 860 F.3d 508, 516 (7th Cir 2017). "[Defendant]'s grudging and incomplete admission, accompanied by an excuse to minimize his own culpability, does not indicate an acceptance

of responsibility." *United States v. Aquilla*, 976 F.2d 1044, 1053–54 (7th Cir. 1992); *see also Jones*, 55 F.3d at 295; *United States v. Rosalez-Cortez*, 19 F.3d 1210, 1219–20 (7th Cir. 1994). Ghuman's version of the offense can readily be characterized as a grudging and incomplete acceptance of responsibility for the actions he took in furtherance of the offense, accompanied by finger-pointing at the bank for not making it more difficult for Brahmbhatt, Ghuman, and the other defendants to perpetrate the multi-million dollar fraud on the bank.

Ghuman admits that he knew that buyers were including false information in the loan applications they submitted to the bank. "Ghuman told himself that this was not his business, but he now understands that he should not have entered into the transaction in such cases." R. 347 at 99. Likewise, Ghuman told the probation officer, "It took me a while to understand, but this was a huge criminal act." R. 347 at 10. These sorts of statements read as though Ghuman simply went along with the wrongs perpetrated by Brahmbhatt, who shepherded the fraudulent loan applications through the bank's approval process, and the buyers, who submitted loan applications laden with false information.

But the record supports the district court's findings that Ghuman did much more than accede to and join in with the wrongdoing perpetrated by co-defendants. He recruited buyers and cajoled them into buying multiple stations, which was obviously to the benefit of himself and Khan as the sellers of the stations. He embraced Brahmbhatt's invitation to circumvent the lending criteria imposed by the bank and the SBA, and bribed him in order to do so. He coached buyers on what they needed to do. He not only supplied equity on behalf

of buyers in some instances, as he admitted in his version of the offense, but, according to Khan, used computer software in other instances to alter checks from the buyers (or their co-signors) in order to give the same impression. He recruited (and encouraged the use of) straw buyers. He provided false bank statements to inflate buyers' assets. And he recruited Mehta to draft false tax returns to again give a false picture of the buyers' financial status.

Ghuman has denied many of these actions, and given the evidence before the district court, Judge Tharp did not clearly err in treating these as false denials. Whether these actions are deemed relevant conduct or inherent in the scheme which underlay his plea of guilty, Ghuman's false denials themselves support the district court's decision to deny him credit for acceptance of responsibility.

Ghuman also told the probation officer that one of the purposes of his 2009-11 stay in India was to seek medical treatment. R. 347 ¶ 86. The district court found that this was a lie, and that Ghuman had really fled this country for India in order to evade prosecution for the crimes which were then under investigation. R. 423 at 37. Again, the record supports this finding. Khan, for example, told the government that Ghuman had no medical condition which necessitated his departure for India. R. 297-2 at 14. Ghuman's statements to the probation officer regarding his flight to India were yet another misrepresentation of what he had done and likewise support the district court's finding as to acceptance.

The district court's findings as to what Ghuman did were based in part on the the grand jury testimony of Brahmbhatt

and Mehta, the proffer of his co-defendant Khan, and the grand jury testimony of two young gas station purchasers, Ali and Oberoi. Noting his due process right to be sentenced on the basis of reliable information, *e.g.*, *United States v. Helding*, 948 F.3d 864, 870 (7th Cir. 2020) (citing *United States v. Tucker*, 404 U.S. 443, 447, 92 S. Ct. 589, 592 (1972)), Ghuman argues that he was deprived of the opportunity to contest the credibility and reliability of these materials before the court based key findings upon them. We disagree.

The record indicates that the government provided copies of the proffer and grand jury transcripts to defense counsel and later submitted them to the probation officer in conjunction with the government's sentencing memorandum; the probation officer in turn attached them to a supplement to the pre-sentence report. R. 296. Consequently, Ghuman had the opportunity to address the credibility and reliability of these materials prior to sentencing but did not take advantage of that opportunity.[4] On consideration of the grand jury transcripts and the proffer, the court found them to be credible. R. 423 at 30, 35. Ghuman contends that not until the court relied on them did he have any reason to object, but this is plainly wrong. Ghuman had access to these materials, he knew what the

---

[4]   In his objections to the pre-sentence report, Ghuman represented that his counsel had not been placed on notice that the government had submitted these materials to the probation officer. R. 299 at 2. However, the government pointed out in response that it had previously produced the materials to defense counsel and had copied counsel on the transmittal of the materials to the probation officer. R. 322 at 2–3. The government's sentencing memorandum also quoted from these materials at some length. R. 297.

government was relying on them for, and he knew that the district court might choose to rely on them. He was bound to object in a timely manner if he believed the district court should not rely on them, and he was instead silent on this point. It is too late in the day to be saying that the court could not properly rely on these materials. Certainly there was no plain error in the court choosing to credit them and to factor these sources into its finding as to acceptance of responsibility.

B.  *Ghuman—erroneous term of supervised release.*

The court imposed a term of three years of supervised release on the false tax return count (Count 23), to be served concurrently with the three-year term on the bank fraud count to which Ghuman had pleaded guilty (Count 1). A three-year term was permissible as to the bank fraud count, but one year is the statutory maximum on the tax fraud count. Section 7206(1) is categorized as a Class E felony because the maximum prison term on that charge is three years, and the maximum term of supervised release for a Class E felony is one year. *See* 18 U.S.C. §§ 3581(b)(5) (deeming Class E felony as one subject to maximum prison term of three years); 26 U.S.C. § 7206 (setting three years as maximum term of imprisonment for false tax return); 18 U.S.C. § 3583 (b)(3) (limiting term of supervised release on Class E felony to maximum of one year).

Ghuman did not raise the issue below, so our review is for plain error only. *See Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1904–05 (2018). To succeed on plain error review, a defendant must show not only that an obvious error occurred, but that the error affected his substantial rights. *Id.* The district court erred, and plainly so, in imposing a term of supervised

release on the tax fraud count that exceeded the statutory maximum. The government nonetheless argues that Ghuman was not prejudiced by the error, because the two terms of supervised release are to run concurrently and a three-year term *is* authorized as to the bank fraud count. *See United States v. Gray*, 332 F.3d 491, 493 (7th Cir. 2003). However, Ghuman has made a plausible case that there still could be material, adverse consequences to him in the future if the error is not corrected– for example, in a revocation proceeding prompted by a charge that he violated the terms of his supervised release, which might lead to the imposition of another prison term (including consecutive terms) imposed on *both* periods of supervised release.

To foreclose that possibility, we may correct the judgment ourselves to modify the term of supervised release on the tax return count to a term of one year. *See, e.g., United States v. Smith*, 906 F.3d 645, 651 (7th Cir. 2018). Ghuman has suggested that we should instead remand for re-sentencing, but we are not convinced that a remand is necessary. The district court imposed the maximum possible term of supervised release (three years) on the bank fraud charge and the maximum possible prison term on the tax return charge (three years), along with what it believed (in error) to be the maximum probationary term of three years. We have no doubt that the court would have imposed the maximum possible term of supervised release (one year) on the latter charge.

C. *Khan restitution – refusal to offset restitution by value of collateral still held by bank.*

As the bank loans that are the subject of this case went into default and AEB foreclosed on those loans, it took possession of the gas stations that were the collateral on the loans; the bank was able to sell some of those properties, but it held onto a dozen of the stations that it was unable to sell for a reasonable price. In calculating Khan's restitution obligation ($10.8 million), the court gave him credit only for the collateral that the bank had already sold. Khan argued that he should have additionally been given credit for the collateral that the bank had not yet sold. The district court rejected this argument, concluding it lacked the authority to credit Khan for the value of the unsold properties in view of the Supreme Court's decision in *Robers v. United States*, 572 U.S. 639, 134 S. Ct. 1854 (2014).

The district court was correct. This case is governed by the Mandatory Victims Restitution Act of 1996 ("MVRA"), which in relevant part provides that a defendant should be credited for the return of stolen property in the restitution calculation. 18 U.S.C. § 3663A(b)(1)(B). *Robers* holds more specifically that for purposes of determining a defendant's restitution obligation in a bank fraud case like this one, the defendant is credited for the amount of money the bank (as victim) receives when it sells the collateral, because only then is the property previously taken from the bank—*i.e.* the money obtained by fraud— restored to the bank's possession. *Id.* at 640–41, 134 S. Ct. at 1856. The defendant in *Robers* contended that he should instead be credited with the value of the collateral at the time

the bank takes title to the collateral—an argument he made because property values were falling and by the time the bank sold the collateral, it was worth less than when the bank took possession of the properties. But the Court rejected that argument, concluding that the relevant value is the value at the time the collateral is sold by the bank. *Ibid.*, *see also id.* at 644, 134 S. Ct. at 1858.

In the course of its analysis, the Court adverted to the scenario presented here, where a victim takes possession of the collateral but is not able to sell it by the time the defendant is sentenced, thus depriving the defendant of credit against his restitution obligation for the value of the collateral. *Robers* noted that the sentencing court was not without some tools to address the potential unfairness to the defendant in this scenario, including delaying the determination of the restitution amount for a short period of time following sentencing in order to give the victim additional time to liquidate the collateral or crediting the defendant for the value of the collateral if the victim has decided to keep it. *Id.* at 644, 134 S. Ct. at 1858 (citing 18 U.S.C. § 3664(d)(5), (f)(2), (f)(3)(A), and (f)(4). "And the Government has conceded that the statute (whether through these or other provisions) provides room for credits against an offender's restitution obligation to prevent double recovery to the victim." *Id.* at 645, 134 S. Ct. at 1858 (cleaned up) (citation omitted). A concurrence by Justice Sotomayor (joined by Justice Ginsburg) makes explicit that because real property is an illiquid investment, it may not be possible in every case for the bank to sell the collateral before sentencing and the imposition of restitution; and so long as the bank has not decided to hold onto the collateral indefinitely as

an investment, a defendant is not entitled to credit at sentencing for the value of the collateral against his restitution obligation. *Id.* at 647–49, 134 S. Ct. at 1859–60 (Sotomayor, J., concurring). "In such cases, I would place on the defendant the burden to show—with evidence specific to the market at issue–that a victim delayed unreasonably in selling collateral, manifesting a choice to hold the collateral." *Id.* at 649, 134 S. Ct. at 1861.

Here, Khan points to no evidence that the bank decided to hold the properties in question as an investment as opposed to being unable to sell the properties immediately at a reasonable price—and indeed, the district court rejected the notion that the bank had made an affirmative decision to hold onto these properties as an investment. R. 451 at 12–14. So the court was correct not to credit Khan for the value of the unsold properties in calculating his restitution obligation.

Relatedly, Khan also faults the district court for failing to anticipate and provide for the *future* sales of the bank-held collateral and corresponding reductions in his restitution obligation. The government agrees that Khan's restitution obligation is subject to modification in the future if and when the bank is able to sell the properties. *Cf. United States v. Dawson*, 250 F.3d 1048, 1051 (7th Cir. 2001) ("were Dawson's co-schemers to pay Rush Hospital any amounts in restitution, we expect that the government would notify Dawson of that occurrence so that she could properly file a request for modification of restitution") (citing § 3364(j)(2) (defendant entitled to credit for "any amount later recovered as compensatory damages for the same loss by the victim" in any federal or state civil proceeding)). The district court itself

acknowledged this possibility. R. 451 at 17. But the government argues that Judge Tharp was not required to provide for such modifications at the time of sentencing, not knowing if or when such sales will occur.

The district court did not err in omitting from the judgment any provision addressing the parties' obligations in the event the unsold collateral is finally liquidated by the bank at some date in the future. In the briefing and at argument, Khan's able counsel suggested that, at a minimum, the bank should have been ordered to notify the parties of such sales so that the parties could take appropriate steps to modify Khan's restitution obligation. That certainly is a reasonable suggestion, but given the extent to which real property sales can be discovered through publicly-available sources, we do not think the court was obligated to incorporate such a provision in the judgment.

D. *Khan—refusal to consider his financial circumstances in determining his restitution obligation.*

No one disputes that Khan does not, at present, have the financial wherewithal to make good on the restitution obligation—$10.8 million—that the district court imposed. Khan asked the district court to consider his financial circumstances when it determined the amount of restitution he owed to the bank. But the court held that full restitution was required and that it was without the authority to consider a lesser amount based on Khan's individual circumstances.

The district court again was correct. Given the terms of the statute, "[t]he economic circumstances of a defendant *cannot* be considered by the court when fixing the amount of the

restitution." *United States v. Sensmeier*, 361 F.3d 982, 988 (7th Cir. 2004) (footnote omitted) (emphasis in original); *see* § 3664(f)(1)(A). As this court recognized in *United States v. Day*, 418 F.3d 746 (7th Cir. 2005), the MVRA elevates the victim's right to full restitution over the defendant's ability to pay:

> Congress, in adopting the MVRA, believed that the law should be concerned first with the victim's right to full restitution and the defendant's concomitant recognition of the duty to pay full restitution, albeit a largely symbolic one. This belief is given effect through § 3664(f), which first requires the court to order "restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A). Therefore, the fact that a defendant may never be able to satisfy a restitution award is no longer grounds for reversing that award.

*Id.* at 758 (footnote omitted). *See also Dolan v. United States*, 560 U.S. 605, 612, 130 S. Ct. 2533, 2539 (2010); *United States v. Malone*, 747 F.3d 481, 485 (7th Cir. 2014); *United States v. Hosking*, 567 F.3d 329, 333 (7th Cir. 2009), *abrogated on other grounds*, *Lagos v. United States*, 138 S. Ct. 1684 (2018).

The district court does have the obligation to consider a defendant's financial obligations in determining how the defendant will pay his restitution obligation—in a lump sum or installments, for example—and on what schedule. § 3664(f)(2), (f)(3); *see Paroline v. United States*, 572 U.S. 434, 485, 134 S. Ct.

1710, 1742 (2014) (Sotomayor, J., dissenting); *Hosking*, 567 F.3d at 335–36.

But we see no support in the record for Khan's contention that the court did not appropriately consider his financial circumstances in setting a reasonable schedule for restitution payments. The court, in fact, concluded that in view of Khan's circumstances, he should not be required to pay interest on his restitution obligation. R. 395 at 2. In addition, the court, in lieu of a lump-sum payment, ordered Khan, upon release from prison, to commence making periodic partial payments equal to 10 percent of his net income. R. 343 at 5. These provisions indicate that the court *was* considering his economic circumstances in laying out the manner and schedule of restitution payments and establishing a realistic payment plan. *See Paroline*, 572 U.S. at 485–87, 134 S. Ct. at 1742–43 (Sotomayor, J., dissenting) (acknowledging importance of partial periodic payment schedules for defendants with limited financial resources).

## III.

The term of supervised release on Ghuman's conviction for filing a false tax return is reduced to one year. His sentence is otherwise affirmed. We likewise affirm Khan's sentence, including the amount and terms of his restitution obligation. We commend Judge Tharp for the extraordinary time, consideration, and care he devoted to resolving the sentencing issues presented in this case.